UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11

OPTIMIZED LEASING, INC.,                        Case No. 1:18-bk-10746-AJC

    Debtor.

_____/

## OPTIMIZED LEASING, INC.'S PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Stichter, Riedel, Blain & Postler, P.A.
Elena Paras Ketchum
Florida Bar No. 0129267
Russell M. Blain
Florida Bar No. 0236314
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Email: eketchum@srbp.com
       rblain@srp.com
Counsel for Debtor and Debtor in Possession

Miami, Florida
Dated: February 14, 2019

PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, NOTHING CONTAINED IN THIS PLAN OF REORGANIZATION (THE "**PLAN**") SHOULD BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THIS PLAN UNTIL SUCH TIME AS THE DEBTOR'S DISCLOSURE STATEMENT (AS DEFINED HEREIN) HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, MIAMI DIVISION, AND DISTRIBUTED, WITH APPROPRIATE BALLOTS, TO ALL HOLDERS OF IMPAIRED CLAIMS AGAINST AND IMPAIRED EQUITY INTERESTS IN THE DEBTOR ENTITLED TO VOTE ON THIS PLAN. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR AN AMENDED AND RESTATED PLAN AND AN AMENDED OR AN AMENDED AND RESTATED DISCLOSURE STATEMENT FROM TIME TO TIME HEREAFTER.  REFERENCE IS MADE TO THE DISCLOSURE STATEMENT FOR A DISCUSSION OF VOTING INSTRUCTIONS, THE DEBTOR'S HISTORY, BUSINESS, PROPERTY, RESULTS OF OPERATIONS, A SUMMARY OF SIGNIFICANT EVENTS THAT HAVE OCCURRED TO DATE IN THE REORGANIZATION CASE, AND THE MEANS OF IMPLEMENTING AND FUNDING THIS PLAN.  ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE HEREBY ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THIS PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS PLAN AND THE DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

## INDEX OF EXHIBITS TO PLAN

**EXHIBIT A -**  **Assumed Executory Contracts and Unexpired Leases; Restructured Loans**

**EXHIBIT B -**  **Rejected Executory Contracts and Unexpired Leases**

# ARTICLE 1
# INTRODUCTION

OPTIMIZED LEASING, INC., as the Debtor and Debtor in Possession in the Reorganization Case, proposes this Plan of Reorganization (the "**Plan**") for the reorganization of the Debtor and the resolution of the outstanding Claims against and Equity Interests in the Debtor pursuant to the provisions of Chapter 11 of the Bankruptcy Code, and requests Confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings ascribed to such terms in Article 2.1 of the Plan.  The Debtor is the proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.

In summary, but subject to more specific details provided herein, the Plan provides for distributions to Creditors with Allowed Claims pursuant to a classic stand-alone plan.  Holders of Secured Claims will receive payment in full of the amount of their Allowed Claims pursuant to terms set forth in Article 5 of the Plan and Unsecured Creditors will receive annual distributions over five (5) years.  Treatment of Assumed Restructured Leases is set forth in Article 7 of the Plan.  Treatment of Administrative Expense Claims, included for Rejected Leases, is set forth in Article 3 of the Plan.  It is anticipated that distributions will be funded principally from cash received from continued business operations.

Under Section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from the Holder of a Claim or Equity Interests until such time as the Debtor's Disclosure Statement for Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code (the "**Disclosure Statement**") has been approved by the Bankruptcy Court and distributed to Holders of Claims and Equity Interests.  The Debtor's Disclosure Statement was conditionally approved by the Bankruptcy Court in the Disclosure Statement Approval Order, which is being distributed simultaneously with the Plan to all Holders of Claims and Equity Interests whose votes are being solicited.  The Disclosure Statement contains, among other things, (a) a discussion of the Debtor's history, business, property, and operations, (b) a summary of significant events that have occurred to date in the Reorganization Case, (c) a summary of the means of implementing and funding the Plan, and (d) the procedures for voting on the Plan.  Other than the Disclosure Statement and any exhibits, schedules, or documents attached thereto or referenced therein, no materials have been approved by the Debtor for use in soliciting acceptances or rejections of the Plan. ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions or modifications to the Plan set forth in Article 13 of the Plan, the Debtor expressly reserves the right to alter, amend, modify, revoke, or withdraw the Plan, one or more times, prior to the Plan's substantial consummation.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THE PLAN AND IN THE ACCOMPANYING DISCLOSURE STATEMENT CONCERNING THE HISTORY OF THE DEBTOR'S OPERATIONS, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTOR,

TRANSACTIONS TO WHICH THE DEBTOR WAS OR IS A PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTOR AND NOT TO ANY OTHER PARTY.

THE PLAN AND THE DISCLOSURE STATEMENT HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING OR SELLING OR TRANSFERRING SECURITIES OF THE DEBTOR SHOULD EVALUATE THE PLAN AND THE DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

## ARTICLE 2
## DEFINED TERMS; RULES OF CONSTRUCTION

2.1    **Defined Terms**.

2.1.1    As used in the Plan, the following terms (which appear in the Plan as capitalized terms) shall have the meanings set forth below:

**"Administrative Expense"** means (a) any cost or expense of administration of the Reorganization Case that is allowed under Section 503(b) or 507(a)(2) of the Bankruptcy Code, to the extent the party claiming any such Administrative Expense files an application or other Bankruptcy Court-approved pleading seeking such expense in the Reorganization Case on or before the applicable Administrative Expense Claims Bar Date, including (i) any actual and necessary costs and expenses of preserving the Estate or operating the business of the Debtor incurred on or after the Petition Date, (ii) any Postpetition cost, indebtedness, or contractual obligation duly and validly incurred or assumed by the Debtor in Possession in the ordinary course of its business, (iii) any Claim granted administrative-expense priority status by a Final Order of the Bankruptcy Court, (iv) any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtor for any Postpetition tax year or period, and (v) compensation or reimbursement of expenses of Professionals awarded or allowed pursuant to an order of the Bankruptcy Court under Section 330(a) or 331 of the Bankruptcy Code (including any amounts held back pursuant to an order of the Bankruptcy Court); (b) all fees and charges assessed against the Estate under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930; and (c) any and all other costs or expenses of administration of the Reorganization Case that are allowed by Final Order of the Bankruptcy Court; provided, however, that, when used in the Plan, the term "Administrative Expense" and "Administrative Expense Claim" shall not include any Priority Tax Claim, any Disallowed Claim, or, unless otherwise expressly provided in the Plan, any of the Claims in Classes 1 through 11.  In no event shall any Claim set out in a Proof of Claim be deemed to be an Administrative Expense (except for any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtor for any Postpetition tax year or period).

**"Administrative Expense Claim"** means any Claim for the payment of an Administrative Expense.

"**Administrative Expense Claims Bar Date**" means, subject to Article 3.1.7 hereof, the date established by one or more orders of the Bankruptcy Court as the deadline for the filing by any Creditor or other party in interest of an application or other Bankruptcy Court-approved pleading for allowance of any Administrative Expense Claim; provided, however, that (a) unless otherwise ordered by the Bankruptcy Court, the Administrative Expense Claims Bar Date for the filing by any Professional of a final application for services rendered or reimbursement for expenses incurred through and including the Effective Date shall be no later than thirty (30) days after the Effective Date, and (b) to the extent the Bankruptcy Court has entered an order establishing a different and specific deadline for a Creditor or other party in interest to file an Administrative Expense Claim, the date set forth in such order shall be deemed to be the Administrative Expense Claims Bar Date as to such Creditor or other party in interest.

"**Administrative Expense Fund**" has the meaning ascribed to such term in Article 3.1.5 of the Plan.

"**Affiliate**" has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code.

"**Allowed Amount**" means the dollar amount in which a Claim is allowed.

"**Allowed Claim**" means a Claim or that portion of a Claim that is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed with the Clerk's Office on or before the Bar Date or, by order of the Bankruptcy Court, was not required to be filed, or (b) as to which no Proof of Claim was filed with the Clerk's Office on or before the Bar Date, but which has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) or (b) above, as to which either (i) no objection to the allowance thereof has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, or (ii) any objection as to its allowance has been settled by the Claim being allowed by a Final Order (but only to the extent so allowed) or withdrawn or has been denied by a Final Order. "Allowed Claim" shall also include a Claim that is allowed by the Bankruptcy Court (a) in a Final Order or (b) pursuant to the terms of the Plan. "Allowed," when used as an adjective herein (such as Allowed Administrative Expense Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, and Allowed Unsecured Claim) has a corresponding meaning.

"**Assets**" means any property or assets of the Debtor of any kind, whether real, personal or mixed, tangible or intangible, or of any nature whatsoever as of the Effective Date.

"**Assumed Restructured Leases**" has the meaning ascribed to such term in Article 7.1.1 of the Plan.

"**Ballot**" means the ballot accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote on the Plan shall indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

"**Banc of America**" means Banc of America Leasing & Capital, LLC.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with all amendments and modifications to the Bankruptcy Code that were subsequently made applicable to the Reorganization Case.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Florida, Miami Division, or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Reorganization Case.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated under Section 2075 of title 28 of the United States Code, and the Local Rules, as in effect on the Petition Date, together with all amendments and modifications to the Bankruptcy Rules that were subsequently made applicable to the Reorganization Case.

"**Bar Date**" means May 29, 2018, the date set by the Bankruptcy Court in the Notice of Chapter 11 Bankruptcy Case (Docket No. 6) as the last day for filing Proofs of Claim against the Debtor in the Reorganization Case, excluding (a) an Administrative Expense Claim for which a request for payment of an Administrative Expense must be filed with the Bankruptcy Court by the Administrative Expense Claims Bar Date, (b) Prepetition Claim of a Governmental Unit, for which a Proof of Claim must be filed with the Bankruptcy Court by the Governmental Unit Bar Date, (c) a Claim for which a bar date may have been otherwise established by a Final Order of the Bankruptcy Court (as to which the bar date shall be as set forth in such Final Order), or (d) a Claim with respect to an executory contract and an unexpired lease that is rejected pursuant to the Plan as to which the bar date shall be as set forth in Article 7 of the Plan or a Final Order of the Bankruptcy Court.

"**BMO Harris**" means BMO Harris, Bank, N.A.

"**Business Day**" means any day other than (a) a Saturday, (b) a Sunday, (c) a "legal holiday" (as "legal holiday" is defined in Bankruptcy Rule 9006(a)), or (d) a day on which commercial banks in Florida are required or authorized to close by law.

"**Cash**" means cash, cash equivalents, and other readily marketable direct obligations of the United States of America, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a Distribution under the Plan, the term "Cash" means lawful currency of the United States of America, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from the Reorganized Debtor drawn on a domestic bank.

"**Causes of Action**" means any and all of the Debtor's or the Estate's  actions, claims, demands, rights, defenses, counterclaims, suits and causes of action, whether known or unknown, in law, equity or otherwise, including (a) all avoidance actions and rights to recover transfers voidable or recoverable under Sections 502, 542, 543, 544, 545, 547, 548, 549, 550, 551,

and/or 553 of the Bankruptcy Code, and (b) any and all other claims or rights of any value whatsoever, at law or in equity, against any Creditor or other third party, including claims of the type referred to in the Disclosure Statement or in Article 8.9 of the Plan; provided, however, that when used in the Plan, the term "Causes of Action" shall not include any Claims, obligations, suits, judgments, damages, rights, remedies, Causes of Action, charges, costs, Debts, indebtedness, or Liabilities released or waived pursuant to the Plan or by order of the Bankruptcy Court. When used in the Plan, the term "Causes of Action" will also specifically include any claims, demands, rights, and causes of action that may only be asserted by a Person other than the Debtor (including the Holder of a Claim) on a derivative or other basis. Causes of Action shall not, under any circumstances, be waived as a result of the failure of the Debtor to describe such Causes of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Debtor or the Reorganized Debtor be estopped or precluded under any theory from pursuing the Causes of Action.  Nothing in the Plan operates as a release of any of the Causes of Action.

**"City National"** means City National Bank of Florida.

**"Claim"** has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.  Notwithstanding anything to the contrary contained in the Plan, when used in the Plan, the term "Claim" shall be given the broadest possible meaning permitted by applicable law and shall include all manner and type of claim, whenever and wherever such claim may arise.

**"Class"** means a category of Claims or Equity Interests classified together as described in Article 4 of the Plan.

**"Clerk"** means the Clerk of the Bankruptcy Court.

**"Clerk's Office"** means the Office of the Clerk of the Bankruptcy Court located at the Claude Pepper Federal Bldg., 51 SW First Ave., Room 1021, Miami, Florida 33130.

**"Collateral"** means Property in which the Debtor's Estate has an interest and that secures, in whole or part, whether by agreement, statute, or judicial decree, the payment of a Claim.

**"Confirmation"** or **"Confirmation of the Plan"** means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

**"Confirmation Date"** means the date on which the Confirmation Order is entered on the Docket by the Clerk pursuant to Bankruptcy Rule 5003(a).

**"Confirmation Funding"** has the meaning ascribed to such term in Article 3.1.5 of the Plan.

**"Confirmation Hearing"** means the hearing which will be held before the Bankruptcy Court at which the Debtor will seek Confirmation of the Plan and related matters pursuant to Section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court in the Reorganization Case confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code, as such order may be amended, modified, or supplemented, which order (including as amended, modified, or supplemented) shall be in form and substance satisfactory to the Debtor.

"**Creditor**" means the Holder of a Claim, within the meaning of Section 101(10) of the Bankruptcy Code, including Creditors with Administrative Expense Claims, Priority Tax Claims, Priority Claims, Secured Claims, and Unsecured Claims.

"**Cure Claim**" means any Claim of any nature whatsoever, including any Claim for any cure payment, cost, or other amount, if any, due and owing by the Debtor pursuant to Section 365(b) of the Bankruptcy Code or otherwise, and any Claim for a default (monetary or non-monetary) arising from, relating to, or in connection with the assumption by the Debtor of an Assumed Contract, in each case as allowed by a Final Order of the Bankruptcy Court. In no event shall any Claim set out in a Proof of Claim be deemed to be a Cure Claim.

"**Debt**" has the meaning ascribed to such term in Section 101(12) of the Bankruptcy Code.

"**Debtor**" means Optimized Leasing, Inc.

"**Debtor in Possession**" means Optimized Leasing, Inc., as debtor in possession in the Reorganization Case.

"**Disallowed Claim**" means any Claim which has been disallowed by an order of the Bankruptcy Court, which order has not been stayed pending appeal.

"**Disclosure Statement**" means the Disclosure Statement for Debtor's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code, dated as of February 14, 2019, including all Exhibits attached thereto, as submitted and filed by the Debtor pursuant to Section 1125 of the Bankruptcy Code in respect of the Reorganization Case and conditionally approved by the Bankruptcy Court in the Disclosure Statement Approval Order, and as such Disclosure Statement may be amended, supplemented, modified, or amended and restated from time to time.

"**Disclosure Statement Approval Order**" means the Order Conditionally Approving Disclosure Statement, Fixing Time to File Objections to the Disclosure Statement, Fixing Time to File Applications for Administrative Expenses, Setting Hearing on Confirmation of the Plan, and Setting Deadlines with Respect to Confirmation Hearing, entered in the Reorganization Case.

"**Disputed Claim**" means any Claim or portion thereof (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed with the Clerk's Office or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules, and, in the case of subparagraph (a) or (b) above, as

to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court.  In addition to the foregoing, a Disputed Claim shall also mean a Claim that is not an Allowed Claim, whether or not an objection has been or may be timely filed, if (a) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (b) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules, (c) any corresponding Claim has been scheduled in the Schedules as disputed, contingent, or unliquidated, (d) no corresponding Claim has been scheduled in the Schedules, or (e) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the objection.  To the extent that the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules (but excluding Claim scheduled as disputed, contingent, or unliquidated), such Claim shall be a Disputed Claim only to the extent of the amount specified in the Proof of Claim which is in excess of the amount of the Claim as scheduled. "Disputed" when used as an adjective herein (such as Disputed Administrative Expense Claim, Disputed Priority Tax Claim, Disputed Priority Claim, Disputed Secured Claim, or Disputed Unsecured Claim) has a corresponding meaning.

"**Distribution**" means a distribution of Cash to a Creditor on account of an Allowed Claim pursuant to the terms of the Plan.

"**Distribution Date**" means the date distributions of cash to a Creditor on account of an Allowed Claim pursuant to terms of the Plan commence under the Plan.

"**Docket**" means the docket in the Reorganization Case maintained by the Clerk.

"**Docket No.**" means the number of the referenced document reflected on the Docket.

"**Effective Date**" means, and shall occur on, the first Business Day of the calendar month following the Confirmation Date so long as all of the conditions to the occurrence of the Effective Date contained in Article 10.2 of the Plan have been satisfied or waived (as provided in Article 10.3 of the Plan).

"**Engs Commercial**" means Engs Commercial Finance Co.

"**Entity**" has the meaning ascribed to such term in Section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means the interests in the Debtor held by all Holders of existing common stock or other similar ownership interests in the Debtor, including any and all options, warrants, or similar instruments for the acquisition of shares of common stock, and any and all

rights to subscribe to or convert into shares of such securities, whether or not such common stock is certificated.

"**Estate**" means the estate created for the Debtor by Section 541 of the Bankruptcy Code upon the commencement of the Reorganization Case.

"**Estimation Hearing**" means a hearing for the estimation of Claims under Section 502(e) of the Bankruptcy Code.

"**Everbank**" means Everbank Commercial Finance.

"**Evolve**" means Evolve Bank & Trust.

"**Exculpated Parties**" has the meaning ascribed to it in Article 11 of the Plan.

"**Exhibit**" means any exhibit annexed to the Plan or to the Disclosure Statement, as the context requires.

"**FCB**" means Florida Community Bank, N.A.

"**Fifth Third**" means Fifth Third Bank.

"**Final Decree**" means the final decree entered by the Bankruptcy Court on or after the Effective Date pursuant to Bankruptcy Rule 3022.

"**Final Decree Date**" means the date on which the Final Decree is entered on the Docket.

"**Final Order**" means (a) an order, judgment, ruling or other decree (or any revision, modification, or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Reorganization Case for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified, or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration, or certiorari has been taken and is pending and the time for the filing of such appeal, petition for review, reargument, rehearing, reconsideration, or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending; or (b) a stipulation or other agreement entered into which has the effect of any such aforesaid order, judgment, ruling, or other decree with like finality.

"**Governmental Unit**" means a governmental unit as such term is defined in Section 101(27) of the Bankruptcy Code.

"**Governmental Unit Bar Date**" means July 20, 2018, the date established by Section 502(a)(9) of the Bankruptcy Code as the last day a Governmental Unit to file a Proof of

Claim against the Debtor in the Reorganization Case (as fixed by Notice of Chapter 11 Bankruptcy Case issued January 22, 2018 (Docket No. 6)).

**"Guarantor"** means any Person that is a guarantor under a contract, lease, or agreement with a Creditor. For the avoidance of doubt, the term "Guarantor" includes the Principals.

**"Holder"** means (a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as shown on the Schedules or books and records of the Debtor or as otherwise determined by order of the Bankruptcy Court, or (iii) if the owner or holder of such Claim has transferred the Claim to a third party and advised the Debtor in writing of such transfer and provided sufficient written evidence of such transfer, the transferee; and (b) as to any Equity Interests, the record owner or holder of such Equity Interests as shown on the books and records of the Debtor or as otherwise determined by order of the Bankruptcy Court.

**"Huntington"** means Huntington National Bank.

**"Impaired"** refers to any Claim or Equity Interests that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**"Liabilities"** means any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to the Debtor or any Affiliate, Subsidiary, Guarantor, predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence taking place prior to the Effective Date in any way relating to the Debtor or any Affiliate, Subsidiary, Guarantor, predecessor, successor or assign thereof, any Assets of the Debtor, the business or operations of the Debtor, the Reorganization Case, or the Plan, including any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness based in whole or in part upon any Claim of or relating to successor liability, transferee liability, or other similar theory; provided, however, that, when used in the Plan, the term "Liabilities" shall not include any obligation of the Debtor or the Reorganized Debtor expressly set forth in the Plan.

**"Lien"** means, with respect to any Asset or Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such Asset or Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

**"Local Rules"** means the Local Rules of the United States Bankruptcy Court for the Southern District of Florida, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Reorganization Case.

"**Net Rejected Lease Administrative Expense Claim**" has the meaning ascribed to such term in Article 3.1.4 of the Plan.

"**Nissan**" means Nissan Motor Acceptance Corp.

"**People's Capital**" means People's Capital and Leasing Corp.

"**Person**" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, Governmental Unit, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

"**Petition Date**" means January 21, 2018, the date on which the Debtor commenced the Reorganization Case by filing its voluntary petition under Chapter 11 of the Bankruptcy Code.

"**Plan**" means the Debtor's Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code dated as of February 14, 2019, and all Exhibits to the Plan, as the same may be amended, supplemented, modified, or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code.

"**Plan Documents**" means all documents that aid in effectuating the Plan, including the Exhibits to the Plan and the Confirmation Order.

"**Postpetition**" means arising or accruing on or after the Petition Date and before the Effective Date.

"**Prepetition**" means arising or accruing prior to the Petition Date.

"**Principals**" means, collectively, Ephrat Afek, Ralph Milman, and Ronen Koubi.

"**Priority Claim**" means a Claim that is entitled to a priority in payment and that is not an Administrative Expense Claim, a Priority Tax Claim, a Secured Claim, or an Unsecured Claim.

"**Priority Tax Claim**" means a Claim of a Governmental Unit that is entitled to a priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Claim, a Secured Tax Claim, or an Unsecured Claim.

"**Professional**" means any professional employed in the Reorganization Case with the approval of the Bankruptcy Court pursuant to Section 327 or 1103 of the Bankruptcy Code.

"**Proof of Claim**" means a proof of claim filed with the Bankruptcy Court with respect to a Claim against the Debtor pursuant to Bankruptcy Rule 3001, 3002, or 3003.

"**Property**" means any property or asset of any kind in which the Debtor or the Estate holds an interest, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

"**Pro Rata Share**" means, with respect to any distribution under the Plan to the Holder of an Allowed Claim in a particular Class or otherwise, a fraction, the numerator of which shall be the amount of such Holder's Allowed Claim and the denominator of which shall be the sum of all Allowed Claims in such Class, all determined as of the applicable Distribution Date.

"**Rejected Leases**" has the meaning ascribed to such term in Article 7.3.1 of the Plan.

"**Reorganization Case**" means the case currently pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, commenced by the Debtor on the Petition Date and presently bears Case No. 1:18-bk-10746-AJC.

"**Reorganized Debtor**" means the Debtor on and after the Effective Date as reorganized pursuant to the Plan.

"**Schedules**" means, collectively, the schedules of assets and liabilities and the statements of financial affairs filed by the Debtor in the Reorganization Case pursuant to Bankruptcy Rule 1007, as such schedules of assets and liabilities or statements of financial affairs have been or may be amended or supplemented from time to time.

"**Secured Claim**" means any Claim that is (a) secured in whole or in part, as of the Petition Date, by a Lien which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the Estate's interest in the value of the Collateral securing any such Claim or the amount subject to setoff, as the case may be.  Except as otherwise provided in the Plan, if the value of a Creditor's interest in the Estate's interest in the Collateral securing such Claim or the amount subject to setoff is less than the amount of the Allowed Claim, the resulting deficiency constitutes an Unsecured Claim.

"**Secured Creditor**" means any Creditor holding a Secured Claim.

"**Secured Tax Claim**" means a Secured Claim of a Governmental Unit for Prepetition taxes.

"**Signature Financial**" means Signature Financial and Leasing, LLC.

"**Stichter Riedel**" means Stichter, Riedel, Blain & Postler, P. A.

"**SunTrust**" means SunTrust Bank, N.A.

"**TCF Equipment**" means TCF Equipment Finance, a division of TCF National Bank.

"**Unimpaired**" refers to a Claim that is not Impaired.

"**United States**" means the United States of America.

"**United States Trustee**" means the Office of the United States Trustee for the Southern District of Florida.

"**Unsecured Claim**" means any Claim (which is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, or Secured Claim) including (a) any Claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (b) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the Creditor's interest in the Estate's interest in the Collateral securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code, or (c) any Claim designated as an Unsecured Claim elsewhere in the Plan.

"**Unsecured Creditor**" means any Creditor holding an Unsecured Claim.

"**Unsecured Creditor Distribution Amount**" means the amount of Ten Thousand Dollars ($10,000.00) set aside annually under the Plan for five years for the purpose of funding payments to Holders of Class 9 Allowed Unsecured Claims.

"**VFS Leasing**" means VFS Leasing Co.

"**Volvo Financial**" means Volvo Financial Services, a division of VFS US, LLC.

"**Voting Deadline**" means the last day to file with the Bankruptcy Court a Ballot accepting or rejecting the Plan as fixed by the Disclosure Statement Approval Order, unless such date is extended by order of the Bankruptcy Court or agreement of the Debtor.

"**Voting Instructions**" means the instructions for voting on the Plan contained in the section of the Disclosure Statement entitled "Voting Instructions."

"**Webster Capital**" means Webster Capital Finance, Inc.

"**Wells Fargo**" means Wells Fargo Equipment Finance, Inc.

2.1.2   Any capitalized term used in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be (with the Bankruptcy Code or the Bankruptcy Rules, as the case may be, controlling in the case of a conflict or ambiguity).

2.2  **Rules of Construction**.

2.2.1.  Any capitalized term used in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be (with the Bankruptcy Code or the Bankruptcy Rules, as the case may be, controlling in the case of a conflict or ambiguity).

2.2.2.  For purposes of the Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified, or supplemented; (d) if the Plan's description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references in the Plan to Articles and Exhibits are references to Articles and Exhibits of or to the Plan; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular Article or section or subsection of the Plan; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Plan shall be deemed incorporated herein by such reference and made a part hereof for all purposes; (i) any reference to an Entity as a Holder of a Claim or Equity Interests includes that Entity's successors and assigns; and (j) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 2.2.

## ARTICLE 3
## TREATMENT OF ADMINISTRATIVE EXPENSE
## CLAIMS AND PRIORITY TAX CLAIMS

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified in the Plan.  The treatment accorded to Administrative Expense Claims and Priority Tax Claims is set forth below in this Article 3.

3.1  **Administrative Expense Claims**.

3.1.1  Except as otherwise provided in this Article 3, each Holder of an Allowed Administrative Expense Claim shall be paid (a) on the Effective Date, an amount, in Cash, equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor, or (c) as otherwise ordered by Final Order of the Bankruptcy Court.

3.1.2  <u>Allowed Administrative Expense Claim for Holders of Restructured Loans</u>.  The treatment accorded loans being restructured by the Debtor is set forth in this Plan, including Article

16

5 pursuant to Classes 2, 3, 4, 5, 7, and 8. The terms set forth in Article 5 as to Classes 2, 3, 4, 5, 7, and 8 address the Allowed Administrative Expenses Claims of those respective Classes.  Other than as set forth in Article 5, Classes 2, 3, 4, 5, 7, and 8 shall receive no other Distribution from the Debtor or the Reorganized Debtor on account of an Allowed Administrative Expense Claim.

3.1.3   Allowed Administrative Expense Claim for Holders of Assumed Restructured Leases.  The treatment accorded to Assumed Restructured Leases by the Debtor is set forth in this Plan, including Article 7.  The terms set forth in Article 7 as to the Assumed Restructured Leases address the Allowed Administrative Expense Claims for Holders of Assumed Restructured Leases. Other than as set forth in Article 7, Holders of Assumed Restructured Leases shall receive no other Distribution from the Debtor or the Reorganized Debtor on account of an Allowed Administrative Expense Claim.

3.1.4   Allowed Administrative Expense Claim for Holders of Rejected Leases. The Allowed Administrative Expense Claim for Holders of Rejected Leases shall be reduced by all amounts received by the Holder from sale, lease, or disposition of the property which is the subject of the Holder's Rejected Lease. The applicable Holder shall file with the Bankruptcy Court a notice stating the amount realized from sale, lease, or disposition of the property and the amount remaining as a claimed Administrative Expense Claim, if any, by the earlier of (i) ten (10) days following the date of the sale, lease, or disposition of the property or (ii) the Voting Deadline.  The Debtor may file with the Bankruptcy Court objection(s) to the notice(s) and the amount(s) asserted therein, with the Bankruptcy Court to resolve any objections. The amount of the Administrative Expense Claim for Holders of Rejected Leases after deducting the amount realized from sale, lease, or disposition of the property is referred to as the "**Net Rejected Lease Administrative Expense Claim**."

3.1.5   Source and Payment of (i) Allowed Administrative Expense Claims for Holders of Rejected Leases and (ii) Allowed Administrative Expense Claim of Professionals. The Debtor shall establish an administrative expense fund (the "**Administrative Expense Fund**") to fund payments to Holders of Allowed Net Rejected Lease Administrative Expense Claims and Holders of Allowed Administrative Expense Claims of Professionals. Prior to the Confirmation Date, the Administrative Expense Fund shall be funded by (hereinafter referred to collectively as the "**Confirmation Funding**"): (i) the Debtor depositing monthly the amount of Thirty Thousand Dollars ($30,000.00) through and until the Confirmation Date and (ii) a one-time deposit in the amount of Two Hundred Thousand Dollars ($200,000.00) furnished by the Guarantors prior to the Confirmation Hearing. After the Confirmation Date, the Debtor or Reorganized Debtor, as applicable, shall fund the Administrative Expense Fund monthly in the amount of Thirty Thousand Dollars ($30,000.00) beginning on the third (3rd) of the month beginning the month following the Confirmation Date and continuing each month thereafter for a period of sixty (60) months.

On the Effective Date, the Debtor or Reorganized Debtor shall remit the then-existing balance of the Administrative Expense Fund on a pro-rata basis to Professionals to be applied to their respective Allowed Administrative Expense Claims.  Beginning on the fifth (5th) of the month beginning the month following the Effective Date and continuing each month thereafter for a period of sixty (60) months, the Administrative Expense Fund shall be distributed on a monthly basis to Holders of Allowed Net Rejected Lease Administrative Expense Claims and Holders of

Allowed Administrative Expense Claims of Professionals as follows: (i) two-thirds of each monthly Distribution from the Administrative Expense Fund shall be remitted on a pro-rata basis to Professionals to be applied to their respective Allowed Administrative Expense Claims and (ii) one-third of each monthly Distribution from the Administrative Expense Fund shall be remitted on a pro-rata basis to Holders of Allowed Net Rejected Lease Administrative Expense Claims to be applied to their respective Claims.  If an Allowed Net Rejected Lease Administrative Expense Claim or an Allowed Administrative Expense Claim of Professional is paid in full during the course of the sixty (60) months, no further Distributions shall be made on account of such Claim.

An Allowed Net Rejected Lease Administrative Expense Claim may be paid under such other terms as may be agreed upon by both the Creditor and Debtor or Reorganized Debtor or as otherwise ordered by order of the Bankruptcy Court.  An Allowed Administrative Expense Claim of Professionals may be paid under such other terms as may be agreed upon by both the Professional and Debtor or Reorganized Debtor or as otherwise ordered by order of the Bankruptcy Court.

3.1.6.   All fees and charges assessed against the Estate under Chapter 123 of Title 28, United States Code, 28 U.S.C. §§ 1911-1930, through the Effective Date shall be paid to the United States Trustee by the Reorganized Debtor by no later than thirty (30) days following the Effective Date.  At the time of such payment, the Reorganized Debtor shall provide to the United States Trustee an appropriate affidavit indicating the disbursements for the relevant periods.  Following the Effective Date, any such fees required pursuant to 28 U.S.C. §1930(a)(6) arising or accruing from distributions made by the Reorganized Debtor or made under the Plan shall also be paid by the Reorganized Debtor.  All such payments to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant post-confirmation periods and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6), until the earlier of (i) the closing of the Reorganization Case by the issuance of a Final Order by the Bankruptcy Court on the Final Decree Date, or (ii) the entry of an order by the Bankruptcy Court dismissing the Reorganization Case or converting the Reorganization Case to another chapter under the Bankruptcy Code.

3.1.7   All Holders of Administrative Expenses (including Holders of any Claims for non-ad valorem Postpetition federal, state, or local taxes) that do not file an application or other Bankruptcy Court-approved pleading by the Administrative Expenses Claims Bar Date will be forever barred from asserting such Administrative Expense against the Debtor, the Reorganized Debtor, or any of their respective Properties or Assets or the Estate, and such Holders shall not be entitled to participate in any distribution under the Plan on account of any such Administrative Expense Claims.

3.2   **Priority Tax Claims**.

3.2.1   Except as otherwise expressly provided in the Plan, each Holder of an Allowed Priority Tax Claim shall be paid by the Debtor or the Reorganized Debtor, as the case may be, deferred equal quarterly Cash payments, commencing on the fifth (5th) of the monthly beginning

the month following the Confirmation Date and continuing each month thereafter for a period of sixty (60) months, and to be paid in full no later than sixty (60) months from the Effective Date.

3.2.2   Holders of Allowed Priority Tax Claims will receive interest on account of its Allowed Priority Tax Claims to the extent allowed under Section 511 of the Bankruptcy Code; provided, however, that if the Holder of such Allowed Priority Tax Claim is a city, county or state, such Holder shall receive interest on account of its Allowed Priority Tax Claim at the applicable statutory rate under state law.

3.2.3   Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtor or the Reorganized Debtor, as the case may be.

## ARTICLE 4
## DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests.  A Claim or Equity Interests (a) is classified in a particular Class only to the extent the Claim or Equity Interests qualifies within the description of that Class and (b) is classified in a different Class to the extent the Claim or Equity Interests qualifies within the description of that different Class.  Unless otherwise expressly stated, the Classes of Claims set forth below include Claims against the Debtor that qualify within the description of that Class. For purposes of the Plan, the Claims and Equity Interests are classified as follows:

4.1   **Class 1:  Priority Claims**.

Class 1 consists of all Allowed Priority Claims.

4.2   **Class 2:  Secured Claim of City National**.

Class 2 consists of the Secured Claim of City National secured by Liens on the Debtor's equipment, fixtures, and inventory.

4.3   **Class 3:  Secured Claim of Evolve**.

Class 3 consists of the Secured Claim of Evolve, secured by Liens on certain of the Debtor's tractors and trailers.

4.4   **Class 4:  Secured Claim of Webster Capital**.

Class 4 consists of the Secured Claim of Webster Capital, secured by Liens on certain of the Debtor's trailers.

4.5   **Class 5:  Secured Claim of Volvo Financial**.

Class 5 consists of the Secured Claim of Volvo Financial, secured by Liens on certain of the Debtor's equipment and/or vehicles.

4.6   **Class 6:  Secured Claims of FCB**.

Class 6 consists of the Secured Claim of FCB, secured by Liens on all of the Debtor's Assets.

4.7   **Class 7:  Secured Claim of Nissan**.

Class 7 consists of the Secured Claim of Nissan, secured by a Lien on a 2015 Nissan Murano bearing VIN 5N1AZ2MG4FN286147.

4.8   **Class 8:  Secured Claim of SunTrust**.

Class 8 consists of the Secured Claim of SunTrust, secured by a Lien on a 2012 Ford Econoline E250 Van V8 Extended Cargo Van bearing VIN 1FTNS2EW0CDA53321.

4.9   **Class 9:  Unsecured Claims**.

Class 9 consists of all Allowed Unsecured Claims.

4.10   **Class 10:  Intercompany Claims**.

Class 10 comprises all Intercompany Claims.

4.11   **Class 11:  Equity Interests**.

Class 11 consists of all Equity Interests in the Debtor.

## ARTICLE 5
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

Allowed Claims and Equity Interests shall be treated under the Plan in the manner set forth in this Article 5.  Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment, and discharge of their respective Allowed Claims (of any nature whatsoever).

5.1   **Unclassified Claims.**

Holders of Allowed Administrative Expense Claims and Allowed Priority Tax Claims shall receive the treatment set forth in Article 3 of the Plan.

5.2    **Class 1:  Priority Claims**.

Class 1 consists of all Allowed Priority Claims.  Each Holder of an Allowed Priority Claim shall be paid (a) on the Effective Date, an amount, in Cash, by the Reorganized Debtor equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, (b) as otherwise agreed to by the Debtor and the Holder of an Allowed Priority Claim, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.  Class 1 is Unimpaired. Each Holder of a Priority Claim in Class 1 is presumed to have accepted the Plan and, therefore, is not entitled to vote to accept or reject the Plan.

5.3    **Class 2:  Allowed Secured Claim of City National**.

5.3.1    Class 2 consists of the Allowed Secured Claim of City National related to contract number 1010038001.

5.3.2    As treatment for its Class 2 Allowed Secured Claim, City National shall retain its liens on the collateral securing its Allowed Secured Claim pursuant to the pre-petition loan documents executed between City National and the Debtor.

5.3.3.    The Allowed Secured Claim of City National shall be in the amount of $905,098.00, consisting of the principal amount of $649,736.00 amortized over seventy-two (72) months at 3.75% *per annum* and a balloon payment of $255,362.00.

5.3.4    The Debtor shall pay City National's Allowed Secured Claim in accordance with the following:

(i)    Seventy-two (72) equal monthly principal and interest installments in the amount of Ten Thousand Eight Hundred and Eighty-Nine Dollars and Forty Cents ($10,889.40).

(ii)    The first monthly principal and interest installment commenced on November 28, 2018 and monthly principal and interest installments shall continue on the 28th day of each month thereafter until the principal amount of $649,736.00 is paid in full, with the final monthly principal and interest installment to be made on October 28, 2024; provided, however, if prior to the last month's payment, the remaining amount due and owing is less than a full month's payment (or the payment associated with each loan schedule, if applicable), then the Debtor shall only pay such remaining amount owed. The balloon payment of $255,362.00 shall be made on September 28, 2024.

(iii)    Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, all or any portion of the Allowed Secured Claim.

5.3.5    The pre-petition loan documents executed by the Debtor and City National shall be deemed amended in accordance with the terms of this Plan, including the following, and otherwise shall remain in effect:

(i)      Upon payment of the applicable amounts set forth herein, with respect to any recorded UCC-1 Financing Statement, City National shall take all commercially reasonable steps necessary to cancel, terminate, and extinguish such UCC-1 Financing Statement, including, without limitation, filing a UCC-3 Amendment Form indicating the termination of any security interest, but in no event later than ten (10) days from receipt of the final payment. In the event such termination is not filed by City National within the 10-day period, the Reorganized Debtor is authorized to file and record such termination.

(ii)     The provisions of the restructured loan shall be deemed amended in accordance with the terms herein and otherwise shall remain in effect, except that all non-monetary default provisions, if any, (such as, for example, financial covenants and provisions regarding loan ratios) shall be eliminated. The Debtor shall provide the following reporting to City National, so long as the restructured loan is outstanding: (a) annual financial statements by no later than 180 days after the end of the calendar year, and (b) quarterly, internally prepared, financial statements provided by no later than 60 days following the end of each quarter. Upon written notice of default for failure to provide annual or quarterly financial statement required by this provision, the Debtor shall have thirty (30) days after receipt of written notice of default to cure any default.

(iii)    The Reorganized Debtor shall be in default under the restructured loan, as amended in accordance with the terms herein, upon the occurrence of the following: (i) failure to make the payments described in Article 5.3.4 above; (ii) failure to maintain insurance on the collateral; (iii) failure to pay taxes on the collateral, if applicable, when due; (iv) failure to provide the quarterly or annual reports required by Article 5.3.5(ii) above; or (v) failure to allow reasonable inspections of collateral upon reasonable advance notice. The Reorganized Debtor shall have thirty (30) days after receipt of written notice of default to cure any default. All other covenants and default provisions shall be eliminated from the restructured loan.

5.3.6    Notwithstanding the above, City National may be paid such other amount and under such other terms as may be agreed upon by City National and the Debtor or the Reorganized Debtor, as the case may be. In addition, notwithstanding the above, the Debtor reserves the right to amend the treatment of the restructured loan terms to conform to any terms and conditions required by the Bankruptcy Court or otherwise necessarily to overcome any objections or in the event the Debtor seeks cramdown, and such modified terms shall become part of this Plan.

5.3.7    Any Claim held by City National in excess of the Allowed Amount of its Allowed Secured Claim shall receive treatment as a Class 9 General Unsecured Claim.

5.3.8    Class 2 is Impaired.

5.4    **Class 3:  Secured Claim of Evolve.**

5.4.1    Class 3 consists of the Allowed Secured Claim of Evolve related to contract number 871-8056261-000.

5.4.2    As treatment for its Class 3 Allowed Secured Claim, Evolve shall retain its liens on the collateral securing its Allowed Secured Claim pursuant to the pre-petition loan documents executed between Evolve and the Debtor.

5.4.3    The Allowed Secured Claim of Evolve shall be in the amount of $477,560.00, consisting of principal amount of $395,870.00 amortized over fifty-eight (58) months at 4.39% *per annum* and a balloon payment of $81,689.00.

5.4.4    The Debtor shall pay Evolve's Allowed Secured Claim in accordance with the following:

(i)    Fifty-eight (58) equal monthly principal and interest installments in the amount of Seven Thousand Eight Hundred and Eighty-Five Dollars and Thirty-Two Cents ($7,885.32).

(ii)    The first monthly principal and interest installment commenced on November 1, 2018 and monthly principal and interest installments shall continue on the 1st day of each month thereafter until the principal amount of $395,870.00 is paid in full, with the final monthly principal and interest installment to be made on August 1, 2023; provided, however, if prior to the last month's payment, the remaining amount due and owing is less than a full month's payment (or the payment associated with each loan schedule, if applicable), then the Debtor shall only pay such remaining amount owed. The balloon payment of $81,689.00 shall be made on July 1, 2023.

(iii)    Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, all or any portion of the Allowed Secured Claim.

5.4.5    The pre-petition loan documents executed by the Debtor and Evolve shall be deemed amended in accordance with the terms of this Plan, including the following, and otherwise shall remain in effect:

(i)    Upon payment of the applicable amounts set forth herein, with respect to any recorded UCC-1 Financing Statement, Evolve shall take all commercially reasonable steps necessary to cancel, terminate, and extinguish such UCC-1 Financing Statement, including, without limitation, filing a UCC-3 Amendment Form indicating the termination of any security interest, but in no event later than ten (10) days from receipt of the final payment.  In the event such termination is not filed by Evolve within the

10-day period, the Reorganized Debtor is authorized to file and record such termination.

(ii)     The provisions of the restructured loan shall be deemed amended in accordance with the terms herein and otherwise shall remain in effect, except that all non-monetary default provisions, if any, (such as, for example, financial covenants and provisions regarding loan ratios) shall be eliminated.  The Debtor shall provide the following reporting to Evolve, so long as the restructured loan is outstanding: (a) annual financial statements by no later than 180 days after the end of the calendar year, and (b) quarterly, internally prepared, financial statements provided by no later than 60 days following the end of each quarter.  Upon written notice of default for failure to provide annual or quarterly financial statement required by this provision, the Debtor shall have thirty (30) days after receipt of written notice of default to cure any default.

(iii)    The Reorganized Debtor shall be in default under the restructured loan, as amended in accordance with the terms herein, upon the occurrence of the following: (i) failure to make the payments described in Article 5.4.4 above; (ii) failure to maintain insurance on the collateral; (iii) failure to pay taxes on the collateral, if applicable, when due; (iv) failure to provide the quarterly or annual reports required by Article 5.4.5(ii) above; or (v) failure to allow reasonable inspections of collateral upon reasonable advance notice.  The Reorganized Debtor shall have thirty (30) days after receipt of written notice of default to cure any default.  All other covenants and default provisions shall be eliminated from the restructured loan.

5.4.6    Notwithstanding the above, Evolve may be paid such other amount and under such other terms as may be agreed upon by Evolve and the Debtor or the Reorganized Debtor, as the case may be.  In addition, notwithstanding the above, the Debtor reserves the right to amend the treatment of the restructured loan terms to conform to any terms and conditions required by the Bankruptcy Court or otherwise necessarily to overcome any objections or in the event the Debtor seeks cramdown, and such modified terms shall become part of this Plan.

5.4.7    Any Claim held by Evolve in excess of the Allowed Amount of its Secured Claim shall receive treatment as a Class 9 General Unsecured Claim.

5.4.8    Class 3 is Impaired.

5.5    **Class 4:  Secured Claim of Webster Capital**.

5.5.1    Class 4 consists of the Allowed Secured Claims of Webster Capital related to contract numbers 001-0048984-911, 001-0048984-912, and 001-0048984-913.

5.5.2    As treatment for its Class 4 Allowed Secured Claims, Webster Capital shall retain its liens on the collateral securing its Allowed Secured Claims pursuant to the pre-petition loan documents executed between the Debtor and Webster Capital.

5.5.3    The Allowed Secured Claims of Webster Capital shall be in the following amounts:

(i)    As to contract number 001-0048984-911, in the principal amount of $24,441.00 amortized over seven (7) months at 4.49% *per annum*.

(ii)    As to contract number 001-0048984-912, in the principal amount of $12,796.00 amortized over seven (7) months at 4.49% *per annum*.

(iii)    As to contract number 001-0048984-913, in the amount of $429,519.00, consisting of principal amount of $328,509.00 amortized over forty-one (41) months at 3.67% *per annum* and a balloon payment of $101,010.00.

5.5.4    The Debtor shall pay Webster Capital's Allowed Secured Claims in accordance with the following as to each contract:

(i)    As to contract number 001-0048984-911, seven (7) equal monthly principal and interest installments in the amount of Three Thousand Five Hundred and Forty-Three Dollars and Ninety-Seven Cents ($3,543.97). The first monthly principal and interest installment commenced on December 1, 2018 and monthly principal and interest installments shall continue on the 1st day of each month thereafter until the principal amount of $24,441.00 is paid in full, with the final monthly principal and interest installment to be made on June 1, 2019; provided, however, if prior to the last month's payment, the remaining amount due and owing is less than a full month's payment (or the payment associated with each loan schedule, if applicable), then the Debtor shall only pay such remaining amount owed. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Allowed Secured Claim.

(ii)    As to contract number 001-0048984-912, seven (7) equal monthly principal and interest installments in the amount of One Thousand Eight Hundred and Fifty-Five Dollars and Forty-Four Cents ($1,855.44). The first monthly principal and interest installment commenced on December 1, 2018 and monthly principal and interest installments shall continue on the 1st day of each month thereafter until the principal amount of $12,796.00 is paid in full, with the final monthly principal and interest installment to be made on June 1, 2019; provided, however, if prior to the last month's payment, the remaining amount due and owing is less than a full month's payment (or the payment associated with each loan schedule, if applicable), then the Debtor shall only pay such remaining amount owed. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Allowed Secured Claim.

(iii)     As to contract number 001-0048984-913, forty-one (41) equal monthly principal and interest installments in the amount of Eight Thousand Eight Hundred and Forty-Five Dollars and Ninety-Four Cents ($8,845.94). The first monthly principal and interest installment commenced on November 1, 2018 and monthly principal and interest installments shall continue on the 11th day of each month thereafter until the principal amount of $328,509.00 is paid in full, with the final monthly principal and interest installment to be made on March 11, 2022; provided, however, if prior to the last month's payment, the remaining amount due and owing is less than a full month's payment (or the payment associated with each loan schedule, if applicable), then the Debtor shall only pay such remaining amount owed. The balloon payment of $101,010.00 shall be made on March 11, 2022. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Allowed Secured Claim.

5.5.5    The pre-petition loan documents executed by the Debtor and Webster Capital shall be deemed amended in accordance with the terms of this Plan, including the following, and otherwise shall remain in effect:

(i)     Upon payment of the applicable amounts set forth herein, with respect to any recorded UCC-1 Financing Statement, Webster Capital shall take all commercially reasonable steps necessary to cancel, terminate, and extinguish such UCC-1 Financing Statement, including, without limitation, filing a UCC-3 Amendment Form indicating the termination of any security interest, but in no event later than ten (10) days from receipt of the final payment.   In the event such termination is not filed by Webster Capital within the 10-day period, the Reorganized Debtor is authorized to file and record such termination.

(ii)    The provisions of the restructured loan shall be deemed amended in accordance with the terms herein and otherwise shall remain in effect, except that all non-monetary default provisions, if any, (such as, for example, financial covenants and provisions regarding loan ratios) shall be eliminated.   The Debtor shall provide the following reporting to Webster Capital, so long as the restructured loan is outstanding: (a) annual financial statements by no later than 180 days after the end of the calendar year, and (b) quarterly, internally prepared, financial statements provided by no later than 60 days following the end of each quarter.   Upon written notice of default for failure to provide annual or quarterly financial statement required by this provision, the Debtor shall have thirty (30) days after receipt of written notice of default to cure any default.

(iii)    The Reorganized Debtor shall be in default under the restructured loan, as amended in accordance with the terms herein, upon the occurrence of the following: (i) failure to make the payments described in Article 5.5.4 above; (ii) failure to maintain insurance on the collateral; (iii) failure to pay taxes

on the collateral, if applicable, when due; (iv) failure to provide the quarterly or annual reports required by Article 5.5.5(ii) above; or (v) failure to allow reasonable inspections of collateral upon reasonable advance notice. The Reorganized Debtor shall have thirty (30) days after receipt of written notice of default to cure any default. All other covenants and default provisions shall be eliminated from the restructured loan.

5.5.6    Notwithstanding the above, Webster Capital may be paid such other amounts and under such other terms as may be agreed upon by Webster Capital and the Debtor. In addition, notwithstanding the above, the Debtor reserves the right to amend the treatment of the restructured loan terms to conform to any terms and conditions required by the Bankruptcy Court or otherwise necessarily to overcome any objections or in the event the Debtor seeks cramdown, and such modified terms shall become part of this Plan.

5.5.7    Any Claim held by Webster Capital in excess of the Allowed Amount of its Secured Claim shall receive treatment as a Class 9 General Unsecured Claim.

5.5.8    Class 4 is Impaired.

5.6    **Class 5: Secured Claim of Volvo Financial.**

5.6.1    Class 5 consists of the Allowed Secured Claims of Volvo Financial related to contract numbers 500-7642515-001, 500-7642515-006, and 500-7642515-007.

5.6.2    As treatment for its Class 5 Allowed Secured Claims, Volvo Financial shall retain its liens on the collateral securing its Allowed Secured Claims pursuant to the pre-petition loan documents executed between the Debtor and Volvo Financial.

5.6.3    The Allowed Secured Claims of Volvo Financial shall be in the following amounts:

(i)    As to contract number 500-7642515-001, in the principal amount of $419,952.00 amortized over forty-eight (48) months at 4% *per annum*.

(ii)    As to contract number 500-7642515-006, in the principal amount of $522,322.00 amortized over forty-eight (48) months at 3.95% *per annum*.

(iii)    As to contract number 500-7642515-007, in the principal amount of $264,478.00 amortized over forty-eight (48) months at 3.95% *per annum*.

5.6.4    The Debtor shall pay Volvo Financial's Allowed Secured Claims in accordance with the following as to each contract:

(i)    As to contract number 500-7642515-001, forty-eight (48) equal monthly principal and interest installments in the amount of Nine Thousand Four Hundred and Eighty-Two Dollars and Twelve Cents ($9,482.12). The first monthly principal and interest installment commenced on December 19, 2018 and monthly principal and interest installments shall continue on the 14th day of each month thereafter until the principal amount of $419,952.00

is paid in full, with the last payment to be made on November 14, 2022; provided, however, if prior to the last month's payment, the remaining amount due and owing is less than a full month's payment (or the payment associated with each loan schedule, if applicable), then the Debtor shall only pay such remaining amount owed.  Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Allowed Secured Claim.

(ii)     As to contract number 500-7642515-006, forty-eight (48) equal monthly principal and interest installments of Eleven Thousand Seven Hundred and Eighty-Two Dollars and Seventy-Four Cents ($11,782.74). The first monthly principal and interest installment commenced on December 19 , 2018 and monthly principal and interest installments shall continue on the 1st day of each month thereafter until the principal amount of $522,322.00 is paid in full, with the last payment to be made on November 1, 2022; provided, however, if prior to the last month's payment, the remaining amount due and owing is less than a full month's payment (or the payment associated with each loan schedule, if applicable), then the Debtor shall only pay such remaining amount owed.  Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Allowed Secured Claim.

(iii)    As to contract number 500-7642515-007, forty-eight (48) equal monthly principal and interest installments in the amount of Five Thousand Nine Hundred and Sixty-Five Dollars and Seventy-Six Cents ($5,965.76). The first monthly principal and interest installment commenced on December 19, 2018 and monthly principal and interest installments shall continue on the 27th day of each month thereafter until the principal amount of $264,478.00 is paid in full, with the last payment to be made on November 27, 2022; provided, however, if prior to the last month's payment, the remaining amount due and owing is less than a full month's payment (or the payment associated with each loan schedule, if applicable), then the Debtor shall only pay such remaining amount owed. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Allowed Secured Claim.

5.6.5    The pre-petition loan documents executed by the Debtor and Volvo Financial shall be deemed amended in accordance with the terms of this Plan, including the following, and otherwise shall remain in effect:

(i)     Upon payment of the applicable amounts set forth herein, with respect to any recorded UCC-1 Financing Statement, Volvo Financial shall take all commercially reasonable steps necessary to cancel, terminate, and extinguish such UCC-1 Financing Statement, including, without limitation, filing a UCC-3 Amendment Form indicating the termination of any security interest, but in no event later than ten (10) days from receipt of the final

payment.  In the event such termination is not filed by Volvo Financial within the 10-day period, the Reorganized Debtor is authorized to file and record such termination.

(ii)     The provisions of the restructured loan shall be deemed amended in accordance with the terms herein and otherwise shall remain in effect, except that all non-monetary default provisions, if any, (such as, for example, financial covenants and provisions regarding loan ratios) shall be eliminated.  The Debtor shall provide the following reporting to Volvo Financial, so long as the restructured loan is outstanding: (a) annual financial statements by no later than 180 days after the end of the calendar year, and (b) quarterly, internally prepared, financial statements provided by no later than 60 days following the end of each quarter.  Upon written notice of default for failure to provide annual or quarterly financial statement required by this provision, the Debtor shall have thirty (30) days after receipt of written notice of default to cure any default.

(iii)    The Reorganized Debtor shall be in default under the restructured loan, as amended in accordance with the terms herein, upon the occurrence of the following: (i) failure to make the payments described in Article 5.6.4 above; (ii) failure to maintain insurance on the collateral; (iii) failure to pay taxes on the collateral, if applicable, when due; (iv) failure to provide the quarterly or annual reports required by Article 5.6.5(ii) above; or (v) failure to allow reasonable inspections of collateral upon reasonable advance notice.  The Reorganized Debtor shall have thirty (30) days after receipt of written notice of default to cure any default.  All other covenants and default provisions shall be eliminated from the restructured loan.

5.6.6    Notwithstanding the above, Volvo Financial may be paid such other amounts and under such other terms as may be agreed upon by Volvo Financial and the Debtor.  In addition, notwithstanding the above, the Debtor reserves the right to amend the treatment of the restructured loan terms to conform to any terms and conditions required by the Bankruptcy Court or otherwise necessarily to overcome any objections or in the event the Debtor seeks cramdown, and such modified terms shall become part of this Plan.

5.6.7    Any Claim held by Volvo Financial in excess of the Allowed Amount of its Secured Claim shall receive treatment as a Class 9 General Unsecured Claim.

5.6.8    Class 5 is Impaired.

5.7    **Class 6:  Secured Claim of FCB.**

5.7.1    Class 6 consists of the Allowed Secured Claim of FCB.

5.7.2    As treatment for its Class 6 Secured Claim, FCB shall retain its liens on the collateral securing its Allowed Secured Claim pursuant to the pre-petition loan documents executed between FCB and the Debtor.

5.7.3    FCB shall continue to receive its regular payments from the co-maker of the debt under the pre-petition loan documents in the normal course.

5.7.4    Any Claim held by FCB in excess of the Allowed Amount of its Secured Claim shall receive treatment as a Class 9 General Unsecured Claim.

5.7.5    Class 6 is Unimpaired.

5.8    **Class 7:  Secured Claim of Nissan.**

5.8.1    Class 7 consists of the Allowed Secured Claim of Nissan.

5.8.2    Nissan shall retain its liens on that certain 2015 Nissan Murano bearing VIN 5N1AZ2MG4FN286147 to secure its Allowed Secured Claim.

5.8.3    Nissan shall commence receiving its regular monthly payments in the amount of $529.75 beginning November 26, 2018 and continuing on the 26th day of each succeeding month thereafter.  As to the five (5) missed payments (for months June 26, 2018 through and including October 26, 2018), the Debtor or Reorganized Debtor shall remit commencing after the Effective Date, a half payment in the amount of $264.87 with each regular payment until the 5-month arrearage is cured.

5.8.4    Following completion of the payments provided in this Section 5.8, Nissan shall release all liens on the collateral securing its Secured Claim and shall file and record all necessary documentation to effectuate such release of liens, but in no event later than ten (10) days from receipt of the final payment.  In the event such termination is not filed by Nissan within the 10-day period, the Reorganized Debtor is authorized to file and record such termination.

5.8.5    Class 7 is Impaired.

5.9    **Class 8:  Secured Claim of SunTrust.**

5.9.1    Class 8 consists of the Allowed Secured Claim of SunTrust.

5.9.2    SunTrust shall retain its lien on that certain 2012 Ford Econoline E250 Van V8 Extended Cargo Van, bearing VIN 1FTNS2EW0CDA53321 to secure its Allowed Secured Claim.

5.9.3    SunTrust shall commence receiving its regular monthly payments in the amount of $431.64 beginning October 11, 2018 and continuing on the 11th day of each succeeding month thereafter.  As to the eight (8) missed payments (for months February 11, 2018 through and including September 11, 2018), the original term of the Retail Installment Sale Contract shall be

extended by an additional eight (8) months (or through and including December 11, 2019) with the Debtor or the Reorganized Debtor remitting the amount of $431.64 on the 11th of each month.

5.9.4    Following completion of the payments provided in this Section 5.9, SunTrust shall release all liens on the collateral securing its Allowed Secured Claim and shall file and record all necessary documentation to effectuate such release of liens, but in no event later than ten (10) days from receipt of the final payment.  In the event such termination is not filed by SunTrust within the 10-day period, the Reorganized Debtor is authorized to file and record such termination.

5.9.5    Class 8 is Impaired.

## 5.10    **Class 9:  General Unsecured Claims.**

5.10.1   Class 9 consists of all Unsecured Claims against the Debtor not otherwise classified in the Plan.

5.10.2   Commencing on the first anniversary of the Effective Date and continuing annually thereafter for four (4) additional years (for a total of five (5)), the Debtor shall distribute to each Holder of an Allowed Class 9 General Unsecured Claim their Pro Rata Share of Ten Thousand Dollars ($10,000.00) (the "**Unsecured Creditor Distribution Amount**"). Distributions to Holders of Allowed Class 9 General Unsecured Claims shall be made no later than the fifth (5th) day of the quarter following the applicable anniversary of the Effective Date.

5.10.3   Class 9 is Impaired.

## 5.11    **Class 10:  Intercompany Claims.**

5.11.1   Class 10 consists of all Intercompany Claims (including those of non-debtor Affiliates).

5.11.2   The Holders of Class 10 Intercompany Claims shall retain their claims; however, each Holder of a Class 10 Intercompany Claim shall receive no distribution on account of such Class 10 Intercompany Claims until all other Allowed Claims have been paid in full.

5.11.3   Class 10 is Impaired.

## 5.12    **Class 11:  Equity Interests.**

5.12.1   Class 11 consists of all Equity Interests in the Debtor.

5.12.2   All Class 11 Equity Interests shall remain in effect; however, each Holder of an Allowed Equity Interests shall receive no distribution on account of its Allowed Equity Interests until all other Allowed Claims have been paid in full.

5.12.3   Class 11 is Unimpaired.

## ARTICLE 6
## ACCEPTANCE OR REJECTION OF THE PLAN

6.1    **Each Impaired Class Entitled to Vote Separately.**

Except as otherwise provided herein, the Holders of Claims in each Impaired Class of Claims shall be entitled to vote separately to accept or reject the Plan.

6.2    **Acceptance by Impaired Classes.**

Classes 2 through 5 and 7 through 10 are Impaired under the Plan, and Holders of Claims in such Classes are entitled to vote to accept or reject the Plan.  Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.  An Impaired Class of Equity Interests shall have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

6.3    **Presumed Acceptance of Plan by Unimpaired Classes.**

Classes 6 and 11 are Unimpaired under the Plan.  Pursuant to Section 1126(f) of the Bankruptcy Code, each such Class and the Holders of Claims in such Classes are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan.  Accordingly, votes of Holders of Claims in such Classes are not being solicited by the Debtor.  Except as otherwise expressly provided in the Plan, nothing contained herein or otherwise shall affect the rights and legal and equitable claims or defenses of the Debtor or the Reorganized Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

6.4    **Impairment Controversies.**

If a controversy arises as to whether any Claim, or any Class of Claims, is Impaired under the Plan, such Claim or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or a particular Class of Claims, under the Plan.

## ARTICLE 7
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 7.1    Assumption of Certain Executory Contracts & Unexpired Leases.

7.1.1    The Debtor proposes under this Plan, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, to assume the executory contracts and unexpired leases identified in the attached **Exhibit A** (the "**Leases**"), as of the Effective Date, upon the terms and conditions set forth as to each lessor in Article 7.2 below with respect to its Lease, which shall constitute a restructuring of such Lease and provide for treatment of any Cure Claim with respect to such Lease (the Leases, as restructured pursuant to Article 7.2, the "**Assumed Restructured Leases**").  Each lessor agrees that the treatment contained in the Assumed Restructured Lease constitutes prompt cure of its Cure Claim with respect to such Lease.

7.1.2    The Debtor shall assume any unexpired lease or sub-lease with any Affiliate, sister company, or related company, with such lease or sub-lease being amended to reflect payment amounts and terms set forth elsewhere in this Plan.  The Debtor or Reorganized Debtor and an Affiliate, sister company, or related company may amend, supplement, or restructure the lease or sub-lease pursuant to such other terms as may be agreed upon by the Debtor or Reorganized Debtor and an Affiliate, sister company, or related company.

7.1.3    Notwithstanding the foregoing in this Article 7.1, the Debtor reserves the right, on or prior to the Confirmation Date, to amend the Plan to identify any executory contract or unexpired lease which is to be rejected or assumed.  The Debtor shall provide notice of any addition or deletion of executory contracts or unexpired leases to the Plan to the parties to the affected executory contracts and unexpired leases. The listing of a document shall not constitute an admission by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor has any liability thereunder. The Debtor reserves the right to file motions to assume or reject any unexpired lease or executory contract not specifically listed in this Article 7.

### 7.2    Terms and Conditions for Assumed Restructured Executory Contracts & Restructured Leases.

As provided in Article 7.1, the Debtor proposes the following as terms and conditions of each of the following Assumed Restructured Leases, which includes treatment of any Cure Claim with respect to each Assumed Restructured Lease:

7.2.1    *Webster Capital Restructured Lease Terms.*  Webster Capital and Debtor are parties to that certain Master Lease Agreement No. 69859 and related Lease Schedules 006-0069859-001, 006-0069859-002, and 006-0069859-003 (collectively, the "**Restructured Webster Lease**"), as deemed amended by the terms and conditions set forth below and in this Plan:

   a)   The total amount, including Prepetition and Postpetition arrearages, due and owing under Lease Schedule 006-0069859-001 is One Hundred Sixty Two Thousand, Three Hundred and Fifty-Four Dollars and Seventy Eight Cents ($162,354.78) (the

"**Webster Lease 001 Balance**"). The Debtor or Reorganized Debtor shall remit fourteen (14) equal monthly installments of Eleven Thousand Five Hundred and Ninety-Six Dollars and Seventy-Seven Cents ($11,596.77). The first payment commenced on December 1, 2018 and shall continue on the 1st day of each month thereafter, with the last monthly installment to be made on January 1, 2020. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Webster Lease 001 Balance.

b)  The total amount, including Prepetition and Postpetition arrearages, due and owing under Lease Schedule 006-0069859-002 is Five Hundred and Forty Thousand, Four Hundred and Four Dollars and Nine Cents ($540,404.09) (the "**Webster Lease 002 Balance**"). The Debtor or Reorganized Debtor shall remit forty-one (41) equal monthly installments of Thirteen Thousand One Hundred and Eighty Dollars and Fifty-Nine Cents ($13,180.59). The first payment commenced on November 28, 2018 and shall continue on the 28th day of each month thereafter, with the last monthly installment to be made on March 28, 2022.  Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Webster Lease 002 Balance.

c)  The total amount, including Prepetition and Postpetition arrearages, due and owing under Lease Schedule 006-0069859-003 is One Million Eighteen Thousand Thirty Dollars and Twenty Six Cents ($1,018,030.26) (the "**Webster Lease 003 Balance**"). The Debtor or Reorganized Debtor shall remit forty-one (41) equal monthly installments of Twenty-Four Thousand Eight Hundred and Thirty Dollars ($24,830.00). The first payment commenced on November 22, 2018 and shall continue on the 22nd day of each month thereafter, with the last monthly installment to be made on March 22, 2022.  Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Webster Lease 003 Balance.

7.2.2  *Huntington Restructured Lease Terms.*  Huntington and Debtor are parties to that certain Master Equipment Lease Agreement dated as of November 26, 2014 (initially with Fifth Third Bank, predecessor in interest to Huntington) and related Equipment Schedule No. 006 dated January 27, 2016 and Equipment Schedule No. 007 dated January 27, 2016 (collectively, the "**Restructured Huntington Lease**"), as deemed amended by the terms and conditions set forth below and in this Plan:

a)  The total amount, including Prepetition and Postpetition arrearages, due and owing under Equipment Schedule No. 006 043-0140353-075 is Two Million Five Hundred and Thirty Thousand Eight Hundred and Ninety-Nine Dollars and Fifty Cents ($2,530,899.50) (the "**Schedule 006 Balance**"). The Debtor or Reorganized Debtor shall remit thirty-nine (39) monthly installments as follows: (a) $65,094.73 (months 1-5), (b) $72,889.90 (months 6 – 10), (c) $63,981.13 (months 11 – 25), (d) $62,867.54 (months 26 – 30), (e) $61,753.94 (months 31-35), and (f) $64,537.93 (months 36-39). The first payment commenced on November 27, 2018 and shall continue on the 27th day of each month thereafter, with the last monthly installment

to be made on January 27, 2022.  Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Schedule 006 Balance.

b)  The total amount, including Prepetition and Postpetition arrearages, due and owing under Equipment Schedule No. 007 043-0140353-067 is Four Hundred Ninety-One Thousand and Seventeen Dollars and Sixty-Three Cents ($491,017.63) (the "**Schedule 007 Balance**"). The Debtor or Reorganized Debtor shall remit thirty-nine (39) monthly installments as follows: (a) $12,845.02 (months 1-5), (b) $14,141.31 (months 6 – 10), (c) $12,412.93 (months 11 – 25), (d) $11,980.83 (months 26 – 35), and (e) $12,520.95 (months 36-39). The first payment commenced on November 27, 2018 and shall continue on the 27th day of each month thereafter, with the last monthly installment to be made on January 27, 2022. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Schedule 007 Balance.

7.2.3    ***ENGS Restructured Lease Terms.***  Engs Commercial and Debtor are parties to those two certain Commercial Lease Agreements – one assigned Contract # 51473 and the other assigned Contract #51485 (together, the "**Restructured Engs Leases**"), as deemed amended by the terms and conditions set forth below and in this Plan:

a)  The total amount, including Prepetition and Postpetition arrearages, due and owing under Contract # 51473 is Two Hundred Seventy-Two Thousand Three Hundred and Seventy-Five Dollars and Eighty-Six Cents ($272,375.86) (the "**Contract 51473 Balance**"). The Debtor or Reorganized Debtor shall remit eight (8) monthly installments as follows: (a) $35,951.99 (November 1, 2018), (b) $20,951.99 (December 1, 2018 and January 1, 2018), (c) $38,903.98 (February 1, 2018 and on the 1st day of the month through and including June 1, 2018).  Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Contract 51473 Balance.

b)  The total amount, including Prepetition and Postpetition arrearages, due and owing under Contract #51485 is Two Hundred and Twenty Thousand Nine Hundred and Thirty-Two Dollars and Ninety-One Cents ($220,932.91) (the "**Contract 51485 Balance**"). The Debtor or Reorganized Debtor shall remit nine (9) monthly installments as follows: (a) $15,000.00 (November 1, 2018), (b) $20,084.81 (November 15, 2018, December 15, 2018, and January 15, 2018), (c) $29,135.70 (February 15, 2019 and on the 15th day of the month through and including June 15, 2019).  Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Contract 51485 Balance.

7.2.4    ***People's Capital Restructured Lease Terms.***  People's Capital and Debtor are parties to that certain Master Lease assigned no. 396051 and Lease Schedule assigned no. 150230 (together, the "**Restructured People's Capital Lease**"), as deemed amended by the terms and conditions set forth below and in this Plan:

a) The total amount, including Prepetition and Postpetition arrearages, due and owing is One Million Two Hundred and Eighteen Nine Hundred and Seventy Dollars and Seventeen Cents ($1,218,970.17) (the "**People's Capital Balance**"). The Debtor or Reorganized Debtor shall remit thirty-six (36) monthly installments as follows: (a) Debtor shall make 15 monthly payments in the amount of $42,424.95, with the first payment being made on November 23, 2018 and the final payment in that amount being made on January 23, 2020 and (b) Debtor shall thereafter make 21 monthly payments in the amount of $27,742.67 to People's Capital, with the first payment being made on February 23, 2020 and the final payment in that amount being made on October 23, 2021. The residual on the Trac lease is the amount of $711,941.91 (the "**People's Trac Lease Payment**"), payable on November 23, 2021. With payment of the People's Trac Lease Payment, all amounts due to People's Capital will have been paid in full. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the People's Capital Balance.

b) Pursuant to the Restructured People's Capital Lease, the Debtor has assumed the following eighteen (18) units:

| 463 | 2016 | VOLVO | VNL780 | 4V4NC9EH2GN954637 |
|-----|------|-------|--------|-------------------|
| 465 | 2016 | VOLVO | VNL780 | 4V4NC9EH4GN954641 |
| 466 | 2016 | VOLVO | VNL780 | 4V4NC9EH6GN954639 |
| 476 | 2016 | VOLVO | VNL780 | 4V4NC9EH9GN954652 |
| 647 | 2016 | VOLVO | VNM64T430 | 4V4MC9EG8GN957917 |
| 371 | 2016 | VOLVO | VNL780 | 4V4NC9EH4GN954946 |
| 468 | 2016 | VOLVO | VNL780 | 4V4NC9EH7GN954634 |
| 483 | 2016 | VOLVO | VNL780 | 4V4NC9EH5GN954647 |
| 650 | 2016 | VOLVO | VNM430 | 4V4MC9EG8GN957920 |
| 477 | 2016 | VOLVO | VNL780 | 4V4NC9EH2GN954654 |
| 478 | 2016 | VOLVO | VNL780 | 4V4NC9EHXGN954658 |
| 479 | 2016 | VOLVO | VNL780 | 4V4NC9EH0GN954653 |
| 467 | 2016 | VOLVO | VNL 780 | 4V4NC9EH6GN954642 |
| 472 | 2016 | VOLVO | VNL 780 | 4V4NC9EH7GN954651 |
| 473 | 2016 | VOLVO | VNL 780 | 4V4NC9EHXGN954644 |
| 656 | 2016 | VOLVO | VNM 430 | 4V4MC9EG9GN957926 |
| 481 | 2016 | VOLVO | VNL780 | 4V4NC9EH8GN954657 |
| 482 | 2016 | VOLVO | VNL780 | 4V4NC9EH5GN954650 |

7.2.5  ***BMO's Restructured Lease Terms.***  BMO and Debtor are parties to that certain Master Vehicle Lease Agreement dated April 8, 2015, that certain Split-Trac Addendum to Master Vehicle Lease Agreement dated April 8, 2015, and those certain Schedule "A" Even Payments (Split-Trac) assigned Account Nos. 7953676011 (dated April 9, 2015), 7953676013 (dated December 18, 2015), 7953676005 (dated April 8, 2015), 7953676008 (dated April 9, 2015), 7953676009 (dated April 9, 2015), and 7953676010 (dated April 8,

2015) (together, the "**Restructured BMO Lease**"), as deemed amended by the terms and conditions set forth below and in this Plan:

a) The total amount, including Prepetition and Postpetition arrearages, due and owing under Account No. 6005 is Five Hundred Twenty-Eight Thousand and Zero Cents ($528,000.00) (the "**Account 6005 Balance**"). The Debtor or Reorganized Debtor shall remit forty-eight (48) equal monthly installments of Eleven Thousand Dollars ($11,000.00) with the first payment being made on October 8, 2018 and the final payment in that amount being made on September 8, 2022. Debtor shall make a final payment in the amount of $9,108.21 on or before September 8, 2022. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Account 6005 Balance.

b) The total amount, including Prepetition and Postpetition arrearages, due and owing under Account No. 6008 is Thirty Thousand Nine Hundred and Sixty Dollars and Zero Cents ($30,960.00) (the "**Account 6008 Balance**"). The Debtor or Reorganized Debtor shall remit thirty-six (36) equal monthly installments of Eight Hundred and Sixty Dollars ($860.00) with the first payment being made on October 9, 2018 and the final payment in that amount being made on September 9, 2021. Debtor shall make a final payment in the amount of $343.28 on or before September 9, 2021. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Account 6008 Balance.

c) The total amount, including Prepetition and Postpetition arrearages, due and owing under Account No. 6009 is Twenty-Eight Thousand Eight Hundred Dollars and Zero Cents ($28,800.00) (the "**Account 6009 Balance**"). The Debtor or Reorganized Debtor shall remit thirty-six (36) equal monthly installments of Eight Hundred Dollars ($800.00) with the first payment being made on October 9, 2018 and the final payment in that amount being made on September 9, 2021. Debtor shall make a final payment in the amount of $329.49 on or before September 9, 2021. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Account 6009 Balance.

d) The total amount, including Prepetition and Postpetition arrearages, due and owing under Account No. 6010 is Two Hundred and Forty Thousand Dollars and Zero Cents ($240,000.00) (the "**Account 6010 Balance**"). The Debtor or Reorganized Debtor shall remit forty-eight (48) equal monthly installments of Five Thousand Dollars ($5,000.00) with the first payment being made on October 9, 2018 and the final payment in that amount being made on September 9, 2022. Debtor shall make a final payment in the amount of $5,119.10 on or before September 9, 2022. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Account 6010 Balance.

e) The total amount, including Prepetition and Postpetition arrearages, due and owing under Account No. 6011 is One Million Two Hundred and Forty-Six Thousand, Sixty-Nine Dollars and Ninety-Two Cents ($1,246,069.92) (the "**Account 6011**

Balance"). The Debtor or Reorganized Debtor shall remit forty-eight (48) equal monthly installments of Twenty-Five Thousand Nine Hundred and Fifty-Nine Dollars and Seventy-Nine Cents ($25,959.79) with the first payment being made on October 9, 2018 and the final payment in that amount being made on September 9, 2022. Debtor shall make a final payment in the amount of $26,303.06 on or before September 9, 2022. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Account 6011 Balance.

f)   The total amount, including Prepetition and Postpetition arrearages, due and owing under Account No. 6013 is One Million Two Hundred and Seventy-Four Thousand, Four Hundred and Six Dollars and Zero Cents ($1,274,406.00) (the "**Account 6013 Balance**"). The Debtor or Reorganized Debtor shall remit sixty (60) equal monthly installments of Twenty-One Thousand, Two Hundred and Forty Dollars and Ten Cents ($21,240.10) with the first payment being made on October 1, 2018 and the final payment in that amount being made on September 1, 2023. Debtor shall make a final payment in the amount of $17,322.78 on or before September 1, 2023. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Account 6013 Balance.

7.2.6   *Signature's Restructured Lease Terms.*   Signature and Debtor are parties to that certain Master Lease Agreement dated December 12, 2014, that certain Equipment Schedule No. 001 (Contract No. 107890001) and that certain Equipment Schedule No. 007 (Contract No. 107890007)(collectively, the "**Restructured Signature Lease**"), as deemed amended by the terms and conditions set forth below and in this Plan:

a)   The total amount, including Prepetition and Postpetition arrearages, due and owing under Schedule No. 001 is Five Hundred and Sixty-Seven Thousand, One Hundred Eighty-Three Dollars and Twenty-Six Cents ($567,183.26) (the "**Schedule 001 Balance**"). The Debtor or Reorganized Debtor shall remit sixteen (16) monthly installments as follows: (a) Debtor shall make six (6) monthly payments in the amount of $36,089.35, with the first payment being made on November 20, 2018 and the final payment in that amount being made on April 20, 2019, (b) Debtor shall thereafter make nine (9) monthly payments in the amount of $24,059.57, with the first payment being made on May 20, 2019 and the final payment in that amount being made on January 20, 2020, and (c) Debtor shall thereafter make one (1) final payment in the amount of $134,110.00 on January 20, 2020. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Schedule 001 Balance.

b)   The total amount, including Prepetition and Postpetition arrearages, due and owing under Schedule No. 007 is Six Hundred and Fifty-Eight Thousand, Six Hundred and Twenty-One Dollars and Ninety-Two Cents ($658,621.92) (the "**Schedule 007 Balance**"). The Debtor or Reorganized Debtor shall remit forty-three (43) monthly installments as follows: (a) Debtor shall make six (6) monthly payments in the amount of $19,110.45, with the first payment being made on November 20, 2018 and the final payment in that amount being made on April 20, 2019, (b) Debtor shall

38

thereafter make thirty-six (36) monthly payments in the amount of $12,740.30, with the first payment being made on May 20, 2019 and the final payment in that amount being made on April 20, 2022, and (e) Debtor shall thereafter make one (1) final payment in the amount of $85,308.42 on April 20, 2022. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Schedule 007 Balance.

c) In addition to, and without limiting any of, the terms and provisions set forth in the Restructured Signature Lease, which such terms and provisions shall remain valid and enforceable, upon an Event of Default under any of the Leases, the Debtor must assemble and turnover possession of all of the equipment under both leases to Signature within five (5) business days after any demand from Signature to assemble and turnover possession of the equipment to Signature.

7.2.7 ***Banc of America's Restructured Lease Terms.*** Banc of America and Debtor are parties to (i) that certain Master Lease Agreement assigned Master Lease Number 27345-90000 dated November 19, 2014 and those certain Schedule Numbers 001, 002, 003, and 004 and (ii) that certain Wells Fargo Equipment Finance, Inc. Master Lease Number 10222154 dated December 12, 2013 and Supplement Number 222154-101 (collectively, the "**Restructured Banc of America Lease**"), as deemed amended by the terms and conditions set forth below and in this Plan:

a) The total amount, including Prepetition and Postpetition arrearages, due and owing under Supplement Number 222154-101 is Two Hundred and Eighty-Three Thousand, Fifty-Four Dollars and Zero Cents ($283,054.00) (the "**Supplement 101 Balance**"). The Debtor or Reorganized Debtor shall remit fifteen (15) equal monthly installments of Eighteen Thousand Eight Hundred and Seventy Dollars and Twenty-Five Cents ($18,870.25). The first payment commenced on October 16, 2018 and shall continue on the 16th day of each month thereafter, with the last monthly installment to be made on December 16, 2019. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Supplement 101 Balance.

b) The total amount, including Prepetition and Postpetition arrearages, due and owing under Schedule Number 001 is One Million Two Hundred and Twenty-Three Thousand, One Hundred and Sixty-Three Dollars and Twenty-Seven Cents ($1,223,163.27) (the "**Schedule 001 Balance**"). The Debtor or Reorganized Debtor shall remit thirty-eight (38) equal monthly installments of Thirty-Two Thousand One Hundred and Eighty-Eight Dollars and Fifty-One Cents ($32,188.51). The first payment commenced on November 5, 2018 and shall continue on the 5th day of each month thereafter, with the last monthly installment to be made on December 5, 2021. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Schedule 001 Balance.

c) The total amount, including Prepetition and Postpetition arrearages, due and owing under Schedule Number 002 is Six Hundred Forty-Four Thousand, Five Hundred

and Eighty-Four Dollars and Six Cents ($644,584.06) (the "**Schedule 002 Balance**"). The Debtor or Reorganized Debtor shall remit thirty-nine (39) equal monthly installments of Sixteen Thousand Five Hundred and Twenty-Seven Dollars and Eighty Cents ($16,527.80). The first payment commenced on November 5, 2018 and shall continue on the 5th day of each month thereafter, with the last monthly installment to be made on January 5, 2022.  Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Schedule 002 Balance.

d)  The total amount, including Prepetition and Postpetition arrearages, due and owing under Schedule Number 003 is Five Hundred and Fifteen Thousand, Eight Hundred and Twenty-Nine Dollars and Seventy-Eight Cents ($515,829.78) (the "**Schedule 003 Balance**"). The Debtor or Reorganized Debtor shall remit fifty-six (56) equal monthly installments of Nine Thousand Two Hundred and Eleven Dollars and Twenty-Five Cents ($9,211.25). The first payment commenced on November 5, 2018 and shall continue on the 5th day of each month thereafter, with the last monthly installment to be made on June 5, 2023.  Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Schedule 003 Balance.

e)  The total amount, including Prepetition and Postpetition arrearages, due and owing under Schedule Number 004 is Fifty Thousand, Thirty-One Dollars and Twenty Cents ($50,031.20) (the "**Schedule 004 Balance**"). The Debtor or Reorganized Debtor shall remit fifty-six (56) equal monthly installments of Eight Hundred and Ninety-Three Dollars and Forty-One Cents ($893.41). The first payment commenced on November 5, 2018 and shall continue on the 5th day of each month thereafter, with the last monthly installment to be made on June 5, 2023. Notwithstanding the foregoing, the Reorganized Debtor may prepay, without penalty, any, all or any portion of the Schedule 004 Balance.

f)  The Restructured Banc of America Leases shall be modified from Split TRAC to Full TRAC. The Liens against all Banc of America equipment shall remain in place until all five (5) Restructured Banc of America Leases are retired (as lease obligations are reduced/eliminated, underlying collateral pool to remain unchanged).  The Debtor shall execute a general release of Banc of America from any claims it may have related to the leases through execution. The state court action initiated by Banc of America against the Guarantors shall be abated until 90 days after Confirmation of the Plan, then shall be dismissed by Banc of America without prejudice if all payments then-due are timely made.

7.2.8    ***Common Provisions to Assumed Restructured Leases***: All Restructured Leases assumed by the Debtor shall be deemed amended by the terms and conditions set forth below and in this Plan:

a)  Upon payment of the applicable amounts set forth herein, with respect to any recorded UCC-1 Financing Statement, the applicable Creditor shall take all

commercially reasonable steps necessary to cancel, terminate, and extinguish such UCC-1 Financing Statement, including, without limitation, filing a UCC-3 Amendment Form indicating the termination of any security interest, but in no event later than ten (10) days from receipt of the final payment. In the event such termination is not filed by the applicable Creditor within the 10-day period, the Reorganized Debtor is authorized to file and record such termination.

b) Notwithstanding the above, the applicable Creditor may be paid such other amounts and under such other terms as may be agreed upon by the applicable Creditor and the Debtor or the Reorganized Debtor, as the case may be. In addition, notwithstanding the above, the Debtor reserves the right to amend the treatment of the restructured lease terms to conform to any terms and conditions required by the Bankruptcy Court or otherwise necessarily to overcome any objections of the applicable Creditor, in the event the Debtor seeks cramdown, and such modified terms shall become part of this Plan.

c) The provisions of the restructured loan shall be deemed amended in accordance with the terms herein and otherwise shall remain in effect, except that all non-monetary default provisions, if any, (such as, for example, financial covenants and provisions regarding loan ratios) shall be eliminated. The Debtor shall provide the following reporting to the applicable Creditor, so long as the restructured lease is outstanding: (a) annual financial statements by no later than 180 days after the end of the calendar year, and (b) quarterly, internally prepared, financial statements provided by no later than 60 days following the end of each quarter. Upon written notice of default for failure to provide annual or quarterly financial statement required by this provision, the Debtor shall have thirty (30) days after receipt of written notice of default to cure any default.

d) The Reorganized Debtor shall be in default under the applicable restructured lease, as amended in accordance with the terms herein, upon the occurrence of the following: (i) failure to make payments described in the applicable subparagraph of Article 7.2 above; (ii) failure to maintain insurance on the collateral; (iii) failure to pay taxes on the collateral, if applicable, when due; (iv) failure to provide the quarterly or annual reports required by subsection Article 7.2.8(c) above; or (v) failure to allow reasonable inspections of collateral upon reasonable advance notice. The Reorganized Debtor shall have thirty (30) days after receipt of written notice of default from the applicable Creditor to cure any default. All other covenants and default provisions shall be eliminated from the restructured leases.

7.3    **Rejection of Executory Contracts & Unexpired Leases Not Otherwise Assumed**.

7.3.1    Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, any unexpired lease or executory contract (i) that has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the rejection of such executory contract or unexpired lease has been filed and served prior to the Effective Date, or (iii) that is specifically designated as a contract or lease to be rejected in this Plan as listed on **Exhibit**

**"B"** (collectively, and including the Rejected Lessor Leases (as defined below), the "**Rejected Leases**") shall be deemed rejected.

7.3.2    Additionally, unless such lease is assumed elsewhere in the Plan, the Debtor hereby rejects all leases in which the Debtor is the lessor under the lease (the "**Rejected Lessor Leases**").

## 7.4    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.1 hereof, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.3 hereof, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease.  The assumption by the Debtor of an Assumed Restructured Lease shall be binding upon any and all parties to such agreement as a matter of law, and each such agreement shall be fully enforceable by the Debtor in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

## 7.5    Inclusiveness.

Unless otherwise specified, each executory contract and unexpired lease that is rejected or assumed shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is specifically referenced in this Plan or in a notice of assumption provided under this Plan.

## 7.6    Damages Arising from Rejection of any Executory Contract or Unexpired Lease.

7.6.1    Any Claim for damages arising by reason of the rejection of any Rejected Lease (a "**Rejection Claim**") must be filed with the Bankruptcy Court on the earlier of (a) thirty (30) days following the date of any order approving the rejection of such Rejected Lease, or (b) thirty (30) days following the Confirmation Date.  Any Rejection Claim must be served upon the Debtor or such Rejection Claim shall be forever barred and unenforceable against the Debtor.

7.6.2    Any party to a Rejected Lease must avail themselves of all commercially reasonable efforts to mitigate damages in connection with the rejection of such Rejected Lease and shall use all commercially reasonable efforts to obtain maximum value in any disposition of the property subject to such Rejected Lease.  Any party who files a Rejection Claim shall only assert such portion of the Rejection Claim that is unmitigated by subsequent sale, lease, or disposition of the property subject to such Rejected Lease and after first application of all proceeds to an Allowed

Administrative Expense Claim. The Bankruptcy Court shall retain exclusive jurisdiction to determine the amount of any Rejection Claim.

7.6.3    All Rejection Claims, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall receive treatment as a Class 9 General Unsecured Claim. Any such Rejection Claims that become Disputed Claims shall be Disputed Claims for purposes of administration of distributions under the Plan to Holders of Allowed Unsecured Claims. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

7.7    **Insurance Policies.**

All of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan. All of the Debtor's insurance policies shall be assumed by the Debtor. Nothing contained in the Plan shall constitute or be deemed a waiver of any Causes of Action that the Debtor or the Reorganized Debtor may hold against any Person or Entity, including the insurers under any of the Debtor's insurance policies.

## ARTICLE 8
## MEANS OF IMPLEMENTATION OF THE PLAN

8.1    **General Overview of the Means of Funding Plan Distributions.**

The Plan provides, in general, for a restructuring of the Debtor's operations through assumption of the Assumed Restructured Leases and the curing of defaults under the Assumed Restructured Leases through the stipulated treatment provided in Article 7 of the Plan. Further, the Debtor will pay go-forward payments under the Assumed Restructured Leases, as modified by the terms provided in Article 7 of this Plan, through the continued restructured operations of the Debtor. With respect to other Claims, including Secured Claims of truck and trailer financiers, the Plan proposes to pay such Claims under the terms provided in Article 5 of this Plan. The Debtor intends to retain its current management team and has and will continue to implement changes in its business model for more cost-effective operations.

8.2    **Vesting of Certain Assets of the Estate in the Debtor.**

On the Effective Date, except as otherwise expressly provided in the Plan, all Assets of the Estate (including the Causes of Action) shall vest in the Reorganized Debtor, free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, encumbrances, and all other interests of every kind and nature, and the Confirmation Order shall so provide. As of the Effective Date, the Reorganized Debtor shall be responsible for the operation of the business, the management of the Assets, the pursuit of Causes of Action, the payment of Allowed Claims, and such other duties imposed by the Plan and the Confirmation Order. All privileges with respect to the Assets of the Debtor's Estate, including the attorney-client privilege, to which the Debtor is

entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtor.

8.3    **Continued Corporate Existence; Tax Consequences.**

The Debtor will continue to exist after the Effective Date as a corporation with all of the powers of a corporation under Florida law and pursuant to its articles of organization or other organizational documents in effect prior to the Effective Date, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date. On the Effective Date, title to the Assets of the Estate shall vest in the Reorganized Debtor.

8.4    **Management and Executive Officers of the Reorganized Debtor.**

The executive officers and directors of the Debtor immediately prior to the Effective Date shall continue their employment and performance of their obligations as officers and directors of the Debtor following the Effective Date. Specifically, Ephrat Afek will remain the President and Chief Executive Officer of the Reorganized Debtor and Ronan Koubi will remain as Chief Operating Officer of the Reorganized Debtor. Ephrat Afek, Ralph Milman, and Ronen Koubi will remain the directors of the Reorganized Debtor. None of the officers or directors of the Reorganized Debtor have been receiving compensation from the Debtor during the course of this Chapter 11 case, which will continue after the Effective Date and through and including such time as all payments required under this Plan are paid in full.

8.5    **Corporate Action.**

All matters provided for under the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, or any corporate action to be taken by or required of the Debtor or the Reorganized Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the director(s) or management of the Debtor or the Reorganized Debtor. From and after the Effective Date, the Reorganized Debtor shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

8.6    **Section 1146 Exemption.**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security or the making, delivery or recording of any instrument of transfer pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the revesting, transfer or sale of any real or personal Property of, by or in the Debtor or the Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the

44

collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. This section shall apply to any transactions on or after the Effective Date, as well as any transactions necessary to effectuate the Plan.

8.7    **Effectuating Documents; Further Transactions.**

Each officer and director of the Debtor or the Reorganized Debtor, as applicable, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents, and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan and the Plan Documents or to otherwise comply with applicable law. With respect to all Secured Claims and Assumed Restructured Leases, to the extent that the Debtor retains the Collateral subject to such Secured Claims or the property subject to such Assumed Restructured Leases, no financial covenants or other technical defaults will exist post-confirmation; and all defaults shall be subject to thirty (30) day cure provisions, unless a longer cure period is provided in the loan or lease agreements.

8.8    **Exclusivity Period**.

The Debtor shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

8.9    **Preservation of Causes of Action.**

8.9.1    On the Effective Date, the Causes of Action shall be vested in the Reorganized Debtor, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by Final Order. The right to pursue Causes of Action shall be vested in the Reorganized Debtor. The Reorganized Debtor will have the rights, powers and privileges, in its absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court. The Debtor is currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtor states that any party in interest that engaged in business or other transactions with the Debtor Prepetition or that received payments from the Debtor Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation.

8.9.2    No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE REORGANIZED DEBTOR. Creditors are advised that legal rights, claims and rights of action the Debtors may have against them, if they

exist, are retained under the Plan for prosecution unless a specific order of the Bankruptcy Court authorizes the Debtor to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtor or the Reorganized Debtor does not possess or does not intend to prosecute a particular claim or cause of action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, Claims, and rights of action of the Debtor, whether now known or unknown, for the benefit of the Reorganized Debtor and the Debtor's Estate. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtor to describe such Cause of Action with specificity in the Plan or the Disclosure Statement; nor shall the Debtor, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action, except as expressly provided otherwise.

8.9.3    The Debtor does not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that the Reorganized Debtor will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any <u>res judicata</u> or collateral estoppel or other preclusive effect which would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

8.9.4    The Reorganized Debtor reserves the right to pursue any or none of the Causes of Action in its sole discretion.

8.10    **Retention of Jurisdiction.**

The Plan provides for the retention of jurisdiction by the Bankruptcy Court following the Effective Date to, among other things, determine all disputes relating to Claims, Equity Interests and other issues presented by or arising under the Plan. The Bankruptcy Court will also retain jurisdiction under the Plan for any actions brought in connection with the implementation and consummation of the Plan and the transactions contemplated thereby.

## ARTICLE 9
## PROVISIONS GOVERNING DISTRIBUTIONS

**9.1** **Determination of Claims.**

9.1.1    After the Effective Date, the Reorganized Debtor shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims. Unless otherwise ordered by the Bankruptcy Court, and except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than ninety (90) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the Reorganized Debtor), and the Confirmation Order shall contain appropriate language to that effect. Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve notice of any request to the Bankruptcy Court for allowance to file late Unsecured Claims on (i) the Reorganized Debtor and (ii) such other parties as the Bankruptcy Court may direct. If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as an Unsecured Claim.  Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date ninety (90) days after the Debtor receives actual notice of the filing of such Claim.

9.1.2    Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtor effects service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Reorganization Case on behalf of the Holder of a Claim.

9.1.3    Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. §157(b)(2)(B) unless the Bankruptcy Court orders otherwise.  If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Reorganization Case, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and distribution.  Upon receipt of a timely-filed Proof of Claim, the Debtor or other party in interest may file a request for estimation along with an objection to the Claim set forth therein.  The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and distribution.  Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

**9.2** **Unclaimed Distributions.**

9.2.1    If the Holder of an Allowed Claim fails to negotiate a check issued to such Holder within 60 days of the date such check was issued, then the Reorganized Debtor will provide written

notice to such Holder stating that unless such Holder negotiates such check within 30 days of the date of such notice, the amount of Cash attributable to such check will be deemed to be unclaimed, such Holder's Claim will no longer be deemed to be Allowed, and such Holder will be deemed to have no further Claim in respect of such check and will not participate in any further distributions under the Plan.

9.2.2    If a distribution pursuant to the Plan to any Holder of an Allowed Claim is returned to the Reorganized Debtor due to an incorrect or incomplete address (as determined by the address listed in the Schedules, on a proof of claim, or on the most current version of the Court's mailing matrix for the Reorganization Case) for the Holder of such Allowed Claim, and no claim is made to the Reorganized Debtor as to such distribution within 30 days of the return of such distribution, then the amount of Cash attributable to such distribution will be deemed to be unclaimed and such Holder will be deemed to have no further Claim in respect of such distribution and will not participate in any further distributions under the Plan.

9.2.3    Any unclaimed distribution described above shall be redistributed to the Holders of Allowed Claims in the same priority set forth in the Plan.

9.3    **Transfers of Claims.**

In the event that the Holder of any Claim transfers such Claim on and after the Effective Date, the Holder shall immediately advise the Reorganized Debtor in writing of such transfer.  The Reorganized Debtor will be entitled to assume that no transfer of any Claim has been made by any Holder unless and until the Reorganized Debtor has received written notice to the contrary.  Each transferee of any Claim will take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given, or other action taken hereunder and, except as otherwise expressly provided in such notice, the Reorganized Debtor will be entitled to assume conclusively that the transferee named in such notice will thereafter be vested with all rights and powers of the transferor under the Plan.

9.4    *De Minimis* **Distributions.**

To avoid the disproportionate expense and inconvenience associated with making *de minimis* distributions, the Reorganized Debtor will not be required to make, and will be excused from making, distributions in amounts of less than ten dollars ($10.00) each to Holders of Allowed Class 9 Claims.

9.5    **One Distribution per Holder.**

If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distributions hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

9.6     **Effect of Pre-Confirmation Distributions.**

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtor or the Reorganized Debtor as applicable to such Holder under the Plan.

9.7     **No Interest on Claims.**

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition interest or the payment of Postpetition interest, penalties, or late charges on account of such Allowed Claim for any purpose.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

9.8     **Compliance with Tax Requirements.**

In connection with the Plan, the Debtor or the Reorganized Debtor, as applicable, shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

## ARTICLE 10
## CONDITIONS PRECEDENT

10.1     **Condition Precedent to Confirmation of the Plan.**

The following is a condition precedent to Confirmation of the Plan: the Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

10.2     **Conditions Precedent to the Effective Date**.

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or may be waived by the Debtor in accordance with Article 10.3 of the Plan:

10.2.1  The Confirmation Funding has been funded prior to the Confirmation Date to be applied in accordance with the Plan and Confirmation Order.

49

10.2.2 The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtor on the Docket of the Reorganization Case, and no stay of the Confirmation Order shall be in effect.

10.3 **Waiver of Conditions Precedent to the Effective Date**.

The conditions precedent set forth in Article 10.2 of the Plan may be waived, in whole or in part, by the Debtor, without notice or a hearing, unless the Bankruptcy Court has entered an order prohibiting any such waiver.

## ARTICLE 11
## DISCHARGE AND GENERAL INJUNCTION

11.1 **Revesting of Property of the Estate in the Reorganized Debtor**.

On the Effective Date, except as otherwise expressly provided in the Plan, all Property and Assets of the Estate shall revest in the Reorganized Debtor free and clear of any and all Liens, Debts, obligations, Claims, Liabilities, and all other interests of every kind and nature, and the Confirmation Order shall so provide.

11.2 **Discharge of Claims**.

Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtor and the Reorganized Debtor from any and all Debts of and Claims of any nature whatsoever against the Debtor that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date.  Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the Debtor and the Reorganized Debtor, and their respective successors or assigns, shall be discharged from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan.  As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of a Claim, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtor or the Reorganized Debtor, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, or Liabilities based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the Plan, and the Confirmation Order shall contain appropriate injunctive language to that effect.  In accordance

with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against the Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtor, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, or Debt.  Notwithstanding the foregoing, the Reorganized Debtor shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan.

11.3    **Exculpation from Liability**.

**The Debtor and its Postpetition directors, officers, managers, employees, and the Professionals for the Debtor (acting in such capacity) (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Reorganization Case, in each case for the period on and after the Petition Date and through the Confirmation Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party.  With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Reorganization Case.  Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy.  The rights granted under this Article 11.3 are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code, prior orders of the Bankruptcy Court, or other applicable law.  In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase or securities.  This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.  Notwithstanding anything to the contrary contained herein, the provisions of this Article 11.3 shall not release, or be deemed a release of, any of the Causes of Action.**

**ANY BALLOT VOTED IN FAVOR OF THE PLAN SHALL ACT AS A CONSENT BY THE CREDITOR CASTING SUCH BALLOT TO THIS EXCULPATION FROM LIABILITY PROVISION.  MOREOVER, ANY CREDITOR WHO DOES NOT VOTE IN FAVOR OF THE PLAN MUST FILE A CIVIL ACTION IN THE BANKRUPTCY COURT ASSERTING ANY SUCH LIABILITY WITHIN THIRTY (30) DAYS FOLLOWING THE EFFECTIVE DATE OR SUCH CLAIMS SHALL BE FOREVER BARRED.**

11.4    **Matching Injunction**.

**Provided that the Reorganized Debtor is not in default of payments due to such Creditor under the Plan, any Creditor, including any party to a restructured loan, an Assumed Restructured Lease, or Rejected Lease, shall be enjoined and barred from taking any of the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Guarantors; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Guarantors; (c) creating, perfecting or enforcing any Lien or encumbrance against the Guarantors; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Guarantors; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Guarantors.  The injunction shall dissolve, with respect to a particular Creditor, in the event that the Reorganized Debtor defaults on the payments set forth in Article 5 or Article 7 of the Plan with respect to the applicable Creditor.  All claims and defenses of Creditors, the Debtor, the Reorganized Debtor, and/or Guarantors shall be preserved.  The Debtor, the Reorganized Debtor, and/or Guarantors shall have the right to independently seek enforcement of this injunction provision.  This injunction provision is an integral part of the Plan and is essential to its implementation.**

**During the time the matching injunction is in place, the Principals shall not receive any distribution from the Reorganized Debtor out of the ordinary course of business without (i) Bankruptcy Court approval or (ii) approval of any affected Debtor-related Creditor.**

11.5    **General Injunction**.

**Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, Liability or Equity Interests that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, Liabilities, or Equity Interests, other than actions brought to enforce any rights or obligations under the Plan: (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the Reorganized Debtor, or their Assets; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Reorganized Debtor, or their Assets; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor, the Reorganized Debtor, or their Assets; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or the Reorganized Debtor; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order, or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtor, or the Reorganized Debtor under the Plan and the**

**documents executed in connection therewith.  The Debtor and the Reorganized Debtor shall have the right to independently seek enforcement of this general injunction provision.  This general injunction provision is an integral part of the Plan and is essential to its implementation.  This provision is cumulative with both the Debtor's and the Reorganized Debtor's other legal rights and remedies.**

**11.6**     **Term of Certain Injunctions and Automatic Stay.**

11.6.1  Except as otherwise ordered by this Court, all injunctions or automatic stays provided for in the Reorganization Case pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Any preliminary or permanent injunction entered by the Bankruptcy Court shall continue in full force and effect following the Confirmation Date and the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

11.6.2  With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish (i) the Debtor's liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code or (ii) one or more Guarantor's liability on Prepetition or Postpetition Claims, such lawsuits shall be deemed dismissed, unless a different time period is set forth in this Plan, as of the Effective Date, unless the Debtor affirmatively elects to have the Debtor's liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtor affirmatively elects to have the automatic stay lifted and to have the Debtor's liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtor as provided herein.

**11.7**     **No Liability for Tax Claims.**

Unless a taxing Governmental Authority has asserted a Claim against the Debtor before the Bar Date or Administrative Expense Claims Bar Date established therefore, no Claim of such Governmental Authority shall be Allowed against the Debtor or the Reorganized Debtor or their respective members, officers or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtor, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

## ARTICLE 12
## RETENTION OF JURISDICTION

12.1    **General Retention**.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Reorganization Case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Reorganization Case that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

12.2    **Specific Purposes**.

In addition to the general retention of jurisdiction set forth in Article 12.1, after Confirmation of the Plan and until the Reorganization Case is closed, the Bankruptcy Court shall retain jurisdiction of the Reorganization Case for the following specific purposes:

12.2.1    to allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interests, including the resolution of any application for an Administrative Expense Claim, and to determine any and all objections to the allowance or priority of Claims or Equity Interests;

12.2.2    to determine any and all Case, controversies, suits or disputes arising under or relating to the Reorganization Case, the Plan or the Confirmation Order (including regarding the effect of any release, discharge, limitation of liability, or injunction provisions provided for herein or affected hereby and regarding whether the conditions to the consummation and/or Effective Date of the Plan have been satisfied);

12.2.3    to determine any and all applications for allowance of compensation of Professionals and reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the Reorganization Case, and to disallow any asserted claims of compensation of any broker or similar person whose employment was not approved by the Bankruptcy Court; provided, however, that this retention of jurisdiction shall not require prior Bankruptcy Court approval of the payment of fees and reimbursement of expenses of Professionals after Confirmation of the Plan unless an objection to such fees and expenses has been made by the Reorganized Debtor;

12.2.4    to determine any and all motions pending as of the date of the Confirmation Hearing (including pursuant to the Plan) for the rejection, assumption, or assignment of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to determine the allowance of any Claims resulting from the rejection thereof or any Cure Claims;

12.2.5    to determine any and all motions, applications, adversary proceedings, contested or litigated matters, Causes of Action, and any other matters involving the Debtor or the Reorganized Debtor commenced in connection with, or arising during, the Reorganization Case and pending on the Effective Date, including approval of proposed settlements thereof;

12.2.6        to enforce, interpret and administer the terms and provisions of the Plan and the Plan Documents;

12.2.7        to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules;

12.2.8        to consider and act on the compromise and settlement of any Claim against or Equity Interests in the Debtor or the Estate;

12.2.9        to assure the performance by the Reorganized Debtor of its obligations under the Plan;

12.2.10       to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Disclosure Statement, the Plan, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

12.2.11       to enforce all orders, judgments, injunctions and rulings entered in connection with the Reorganization Case;

12.2.12       to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Plan Documents;

12.2.13       to review and approve any sale or transfer of assets or Property by the Debtor or the Reorganized Debtor, including prior to or after the date of the Plan, and to determine all questions and disputes regarding such sales or transfers;

12.2.14       to determine all questions and disputes regarding title to the assets of the Debtor, the Estate, or the Reorganized Debtor;

12.2.15       to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtor arising on or prior to the Effective Date or arising on account of transactions contemplated by the Plan, including to determine any motion that may be filed after the Effective Date as necessary to obtain a tax refund from the Internal Revenue Service;

12.2.16       to resolve any determinations which may be requested by the Debtor or the Reorganized Debtor of any unpaid or potential tax liability or any matters relating thereto under Sections 505 and 1146 of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion thereof ending on or before the Effective Date;

12.2.17      to resolve any disputes concerning any release of or limitation of liability as to a nondebtor hereunder or the injunction against acts, employment of process or actions against such nondebtor arising hereunder;

12.2.18      to determine any motions or contested matters relating to the Causes of Action commenced in the Bankruptcy Court, whether brought before or after the Effective Date;

12.2.19      to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

12.2.20      to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

12.2.21      to determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Documents;

12.2.22      to enter such orders as are necessary to implement and enforce the injunctions described herein;

12.2.23      to determine such other matters and for such other purposes as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; and

12.2.24      to enter an order concluding and terminating the Reorganization Case.

12.3     **Closing of the Reorganization Case**.

In addition to the retention of jurisdiction set forth in Articles 12.1 and 12.2, the Bankruptcy Court shall retain jurisdiction of the Reorganization Case to enter an order reopening the Reorganization Case after it has been closed.

## ARTICLE 13
## MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTIONS

13.1     **Modification of Plan.**

13.1.1      The Debtor may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements.

13.1.2      After the entry of the Confirmation Order, the Debtor or the Reorganized Debtor (as the case may be) may modify the Plan to remedy any defect or omission or to reconcile any inconsistencies in the Plan or in the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that (a) the Debtor or the Reorganized Debtor (as the case may be) obtains Bankruptcy Court approval for such modification, after notice and a hearing,

and (b) such modification does not materially adversely affect the interests, rights, or treatment of any Class of Claims or Equity Interests under the Plan.

13.1.3      After the Confirmation Date and before substantial consummation of the Plan, the Debtor or the Reorganized Debtor (as the case may be) may modify the Plan in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims or Equity Interests, provided that (a) the Plan, as modified, meets applicable Bankruptcy Code requirements; (b) the Debtor or the Reorganized Debtor (as the case may be) obtains Bankruptcy Court approval for such modification, after notice and a hearing; (c) such modification is accepted by at least two-thirds in dollar amount, and more than one-half in number, of Allowed Claims or by at least two-thirds in amount of Allowed Equity Interests voting in each Class adversely affected by such modification; and (d) the Debtor or the Reorganized Debtor (as the case may be) complies with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified.

13.1.4      Notwithstanding anything to the contrary contained in this Article 13.1 or elsewhere in the Plan, the Plan may not be altered, amended or modified without the written consent of the Debtor or the Reorganized Debtor (as the case may be).

## 13.2    **Confirmation Over Objections**.

If any Impaired Class of Claims or Equity Interests votes against the Plan, and the Plan is not revoked or withdrawn in accordance with Article 14.2, the Debtor hereby requests, and shall be allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting distributions to all Classes at or below the level of the objecting Class, or reallocating such distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code.  The Debtor may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing.  No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims or Equity Interests unless the Bankruptcy Court shall require otherwise.  Notwithstanding any provision of the Plan to the contrary, the Debtor reserves any and all rights it may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

## 14.1    **No Admissions**.

The Plan provides for the resolution, settlement and compromise of Claims against and Equity Interests in the Debtor.  Nothing herein shall be construed to be an admission of any fact or otherwise binding upon the Debtor in any manner prior to the Effective Date.

14.2    **Revocation or Withdrawal of the Plan**.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void in all respects and nothing contained in the Plan shall be deemed to (a) constitute a waiver or release of any Claims against, or Equity Interests in, the Debtor or any other Person, or (b) prejudice in any manner the rights of the Debtor or any other Person in any further proceedings involving the Debtor.

14.3    **Standard for Approval of the Bankruptcy Court**.

In the event any of the matters described herein are brought for approval before the Bankruptcy Court, then any such approval shall mean the entry of an order by the Bankruptcy Court approving the matter using the standards for approval of similar matters by a Chapter 11 debtor in possession.

14.4    **Further Assurances**.

Each of the Debtor and the Reorganized Debtor agrees, and is hereby authorized, to execute and deliver any and all papers, documents, contracts, agreements and instruments which may be necessary to carry out and implement the terms and conditions of the Plan.

14.5    **Headings**.

The headings and table of contents used in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

14.6    **Notices**.

All notices, requests or other documents in connection with, or required to be served by, the Plan shall be in writing and shall be sent by first class United States mail, postage prepaid, or by overnight delivery by a recognized courier service, to the Debtor or the Reorganized Debtor, at 3400 NW 74th Avenue, Unit 1, Miami, Florida 33122, c/o Ronen Koubi, Chief Operations Officer, and Boyan Mintchev, Chief Financial Officer, with a copy to Elena Paras Ketchum, Esq., Stichter, Riedel, Blain & Postler, P.A., 110 E. Madison Street, Suite 200, Tampa, Florida 33602.

14.7    **Governing Law**.

Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or where the Plan or the provision of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflicts of law thereof.

14.8    **Limitation on Allowance**.

No attorneys' fees, punitive damages, penalties, exemplary damages, or interest shall be paid with respect to any Claim or Equity Interests except as otherwise specified in the Plan or as Allowed by a Final Order of the Bankruptcy Court.

14.9    **Estimated Claims**.

To the extent any Claim is estimated for any purpose other than for voting on the Plan, then in no event shall such Claim be Allowed in an amount greater than the estimated amount.

14.10    **Consent to Jurisdiction**.

14.10.1    Upon any default under the Plan, the Debtor and the Reorganized Debtor consent to the jurisdiction of the Bankruptcy Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to any such default.

14.10.2    By accepting any distribution or payment under or in connection with the Plan, by filing any Proof of Claim, by filing any Administrative Expense Claim, by voting on the Plan, by reason of being served with notice of the filing of the Reorganization Case or the Confirmation Hearing, or by entering an appearance in the Reorganization Case, all Creditors, Holders of Equity Interests and other parties in interest, including foreign Creditors and foreign parties in interest, have consented, and shall be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the Plan or the Reorganization Case, including the matters and purposes set forth in Article 12 of the Plan.  The Bankruptcy Court shall maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in Article 12 of the Plan.

14.11    **Setoffs**.

Subject to the limitations provided in Section 553 of the Bankruptcy Code, the Reorganized Debtor may, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claim that the Debtor may have against the Holder of such Claim.

14.12    **Successors and Assigns**.

The rights, benefits, duties and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

14.13  **No Interest**.

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition interest or the payment of Postpetition interest, penalties, or late charges on account of such Allowed Claim for any purpose.

14.14  **Modification of Payment Terms**.

The Reorganized Debtor reserves the right to modify the treatment of any Allowed Claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date, upon the consent of the Holder of such Allowed Claim.

14.15  **Entire Agreement**.

The Plan sets forth the entire agreement and undertakings relating to the subject matter hereof and supersedes all prior discussions and documents.  No Person or Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by such Person or Entity in writing.

14.16  **Severability of Plan Provisions**.

If, prior to Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term or provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

14.17  **Confirmation Order and Plan Control**.

To the extent the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtor or the Reorganized Debtor and any third party, unless otherwise expressly provided in the Plan or the Confirmation Order, the Plan controls over the Disclosure Statement and any such agreement, and the Confirmation Order (and any other Final Orders of the Bankruptcy Court) shall be construed together and consistent with the terms of the Plan.

14.18   **Computation of Time**.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

14.19   **Substantial Consummation**.

The Plan shall be deemed to be substantially consummated within the meaning of Section 1101 of the Bankruptcy Code upon commencement by the Reorganized Debtor of the distributions described in the Plan.

14.20   **No Liability for Solicitation.**

Pursuant to Section 1125(e) of the Bankruptcy Code, any Person that solicits acceptances or rejections of the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

[*remainder of page intentionally blank*]

Dated: February 14, 2019

OPTIMIZED LEASING, INC.

By: _____

Ronen Koubi
Chief Operating Officer

*/s/ Elena Paras Ketchum*
Elena Paras Ketchum
Florida Bar No. 0129267
Stichter, Riedel, Blain & Postler, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Email: eketchum@srbp.com
Attorneys for Debtor

**Exhibit A**

**ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
RESTRUCTURED LOANS**

**I.  Assumed Executory Contracts and Unexpired Leases:**

Engs Commercial

BMO Harris

Banc of America

Webster Capital

Signature Financial

People's Capital

Huntington

**II.  Restructured Loans:**

Webster Capital

Volvo Financial

Evolve

City National

SunTrust

Nissan

## **Exhibit B**

### **REJECTED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Fifth Third

Everbank

TCF Equipment

VFS Leasing

Wells Fargo